## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Abingdon Division

| | |
|---|---|
| COURTHOUSE NEWS SERVICE; LEE ENTERPRISES, INCORPORATED; AND LEE BHM LLC, PUBLISHER OF THE RICHMOND TIMES-DISPATCH, THE ROANOKE TIMES, BRISTOL HERALD COURIER, LYNCHBURG NEWS AND ADVANCE, FREDERICKSBURG FREE LANCE STAR AND THE DAILY PROGRESS. | Civil Action No. 1:25-cv-0075-JPJ-PMS |

Plaintiff,

v.

KARL R. HADE, in his official
capacity as Executive Secretary of the Office
of Executive Secretary of the Supreme Court
of Virginia,

and

EDWARD JEWETT, in his official
capacity as Clerk of the Circuit Court for the
City of Richmond, Virginia,

and

BRENDA HAMILTON, in her official
capacity as Clerk of the Circuit Court for the
City of Roanoke, Virginia,

and

KELLY FLANNAGAN, in her official
capacity as Clerk of the Circuit Court for the
City of Bristol, Virginia

Defendants.

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

    A.    OCRA's Restrictions Bar CNS and Lee From Reporting on
Cases in Many Courts ............................................................................. 5

    B.    OCRA's Restrictions are Enforced by Defendant Hade and Defendant Clerks..... 6

    C.    OCRA Restrains Subscribers from Providing Information to CNS and Lee.......... 7

I. DEFENDANTS OVERLOOK CLEAR PRECEDENT HOLDING CNS AND LEE HAVE
STANDING TO PROTECT THEIR FIRST AMENDMENT RIGHT TO GATHER NEWS ...... 9

    A.    The Complaint Plausibly Alleges Injury to CNS and Lee the
Court Can Redress ................................................................................. 10

        1.    Under Governing Precedent, CNS' and Lee's
Newsgathering is Being Injured.................................................. 10

        2.    The Complaint Alleges Attorneys Are Willing to Speak
But For the Restriction................................................................ 13

    B.    Lee Enterprises' Harm From the Restriction Give It
Standing as Well as Lee BHM ................................................................ 16

II. THE AS-APPLIED CLAIM BY CNS AND LEE IS RIPE BECAUSE THE
DISSEMINATION RESTRICTION CURRENTLY IMPAIRS NEWSGATHERING .............. 18

III. DEFENDANTS' ELEVENTH AMENDMENT "ENFORCEMENT" ARGUMENTS
FARE NO BETTER AT THIS PLEADING STAGE THAN THEY DID IN *HADE I* ............... 20

    A.    Defendant Hade's Eleventh Amendment Ignores *Hade I* as Well as CNS' and
Lee's Factual Allegations Here That Are More Than
Sufficient at This Pleading Stage ........................................................... 20

    B.    The Defendant Clerks Enforcement Argument Misunderstands How
"Discretion" Is Relevant For *Ex Parte Young* Purposes
In This First Amendment Case ............................................................... 25

IV. THE DISSEMINATION RESTRICTION IS A RESTRAINT ON PROTECTED
SPEECH ABOUT CIVIL COURT RECORDS ON OCRA THAT IMPAIRS
NEWSGATHERING, AND THUS IS UNCONSTITUTIONAL
UNLESS IT SATISFIES STRICT SCRUTINY .......................................................... 28

    A.    Strict Scrutiny Applies to Restraints on Disseminating
Content from Court Records................................................................... 29

        1.    *Soderberg* Requires that District Courts Apply Strict Scrutiny Even to
Partial Bans On Disseminating Information Obtained from
Publicly Available Court Records ............................................... 29

i

2.     Strict Scrutiny Applies to Restraints on Speaking with the Media about Civil Cases ............................................................. 30

B.     Defendants' Arguments for Not Applying Any Scrutiny to the Restriction All Fail................................................................................ 33

1.     Contractual Waivers of Constitutional Rights Do Not Apply to Statutory Restraints..................................................... 33

2.     The Court Must Decline Defendants' Plea to Ignore the Plain Text of the Restriction ...................................................... 36

3.     CNS and Lee Have Stated Both Facial and As Applied Claims............... 39

V. DEFENDANTS DO NOT ARGUE THE DISSEMINATION RESTRICTION SURVIVES STRICT SCRUTINY AND THE SCRUTINY THEY APPLY REQUIRES FACTUAL EVIDENCE THEY HAVE NOT AND CANNOT PRESENT AT THIS STAGE....................... 43

CONCLUSION.................................................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Holder,*
    673 F.3d 245 (4th Cir. 2011) ...................................................................................16

*Alexander v. United States,*
    509 U.S. 544 (1993)..........................................................................................30, 37

*Am. Entertainers, LLC v. City of Rocky Mount,*
    888 F.3d 707 (4th Cir. 2018) ........................................................................2, 32, 41

*In re Andrews,*
    80 F.3d 906 (4th Cir. 1996) ...................................................................................36

*Animal Legal Def. Fund v. Kelly,*
    9 F.4th 1219 (10th Cir. 2021) ................................................................................38

*Antrican v. Odom,*
    290 F.3d 178 (4th Cir. 2002) ........................................................................2, 26, 27

*Ass'n of Am. Railroads v. Hudson,*
    144 F.4th 582 (4th Cir. 2025) ................................................................................42

*Baltimore Sun Co. v. State,*
    667 A.2d 166 (Md. App. 1995).................................................................................35

*Billups v. City of Charleston,*
    194 F. Supp. 3d 452 (D.S.C. 2016).........................................................................44

*Billups v. City of Charleston,*
    961 F.3d 673 (4th Cir. 2020) ............................................................................44, 45

*Board of Cnty Comm'rs v. Umbehr,*
    518 U.S. 668 (1996).................................................................................................34

*Branzburg v. Hayes,*
    408 U.S. 665 (1972)......................................................................................11, 12, 13

*Brooks v. St. Charles Hotel Operating, LLC.,*
    2023 WL 6244612 (D. Md. Sept. 26, 2023) ...........................................................27

*Bruce & Tanya & Assocs. v. Bd. of Supervisors of Fairfax Cty.,*
    854 F. App'x 521 (4th Cir. 2021) ...........................................................................19

*Bruni v. City of Pittsburgh*,
 824 F.3d 353 (3d Cir. 2016)..................................................................................44

*In re Callaway*,
 1978 WL 222036 (Bankr. E.D. Va. Oct. 26, 1978) ................................................38

*Caplin & Drysdale, Chartered v. United States*,
 491 U.S. 617 (1989).............................................................................................15

*Carroll v. New People's Bank, Inc.*,
 2018 WL 1659482 (W.D. Va. Apr. 5, 2018) ..........................................................17

*CBS Inc. v. Young*,
 522 F.2d 234 (6th Cir. 1975) (per curiam).............................................9, 11, 30, 31

*In re Charlotte Observer*,
 921 F.2d 47 (4th Cir. 1990) ...................................................................................3

*Citizens United v. Schneiderman*,
 882 F.3d 374 (2d Cir. 2018)..................................................................................40

*City of Lakewood v. Plain Dealer Pub'g Co.*,
 486 U.S. 750 (1988)..................................................................................... *passim*

*Classic Commc'ns, Inc. v. Rural Tel. Serv. Co.*,
 956 F. Supp. 896 (D. Kan. 1996)..........................................................................17

*Clatterbuck v. City of Charlottesville*,
 708 F.3d 549 (4th Cir. 2013) ..................................................................................4

*Connecticut Mag. v. Moraghan*,
 676 F. Supp. 38 (D. Conn. 1987)...........................................................................31

*Cooksey v. Futrell*,
 721 F.3d 226 (4th Cir. 2013) ....................................................................... *passim*

*Courthouse News Serv. v. Gilmer*,
 48 F.4th 908 (8th Cir. 2022) .................................................................................26

*Courthouse News Serv. v. Hade*,
 580 F. Supp. 3d 289 (E.D. Va. 2022) ............................................................ *passim*

*Courthouse News Serv. v. Hade*,
 631 F. Supp. 3d 349 (E.D. Va. 2022) ............................................................ *passim*

*Courthouse News Serv. v. Planet*,
 750 F.3d 776 (9th Cir. 2014) .............................................................................5, 39

*Courthouse News Serv. v. Planet*,
    947 F.3d 581 (9th Cir. 2020) ..............................................................................5

*Courthouse News Serv. v. Schaefer*,
    2 F.4th 318 (4th Cir. 2021) ............................................................36, 39, 42, 47

*Courthouse News Serv. v. Smith*,
    126 F.4th 899 (4th Cir. 2025) .................................................................. *passim*

*Cox Broadcasting Corp. v. Cohn*,
    420 U.S. 469 (1975)..................................................................................34, 43

*Crandon v. United States*,
    494 U.S. 152 (1990)........................................................................................36

*Deep South Today v. Murrill*,
    779 F. Supp. 3d 782 (M.D. La. 2025)................................................................18

*Democracy Rising PA v. Celluci*,
    603 F. Supp. 2d 780 (M.D. Pa. 2009) ...............................................................19

*Dirks v. Bd. of Cnty. Comm'rs.*,
    2016 WL 2989240 (D. Kan. May 24, 2016).................................................37, 40

*Doe v. Pub. Citizen*,
    749 F.3d 246 (4th Cir. 2014) .................................................................. *passim*

*In re Dow Jones & Co.*,
    842 F.2d 603 (2d Cir. 1998)............................................................................31

*Doyle v. Hogan*,
    1 F.4th 249 (4th Cir. 2021) .......................................................................21, 25

*Edgar v. Haines*,
    2 F.4th 298 (4th Cir. 2021) ............................................................2, 10, 13, 18

*Elephant Butte Irr. Dist. v. Dep't of Interior*,
    160 F.3d 602 (10th Cir. 1998) ........................................................................26

*Evans v. United States*,
    105 F.4th 606 (4th Cir. 2024) ..........................................................................4

*In re Express-News*,
    695 F.2d 807 (5th Cir. 1982) ....................................................................28, 30

*Faircloth v. Lundy Packing Co.*,
    91 F.3d 648 (4th Cir. 1996) ............................................................................36

*Flynt v. Rumsfeld*,
    355 F.3d 697 (D.C. Cir. 2004) ............................................................................................18

*Food Line, Inc. v. Capital Cities/ABC, Inc.*,
    194 F.3d 505 (4th Cir. 1999) ..............................................................................................13

*Fuentes v. Shevin*,
    407 U.S. 67 (1972) ..............................................................................................................35

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ............................................................................................................19

*Globe Newspaper Co. v. Superior Court*,
    457 U.S. 596 (1982) ..........................................................................................28, 36, 39, 42

*Goines v. Valley Cmty. Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ................................................................................................4

*Hirschkop v. Snead*,
    594 F.2d 356 (4th Cir. 1979) ..............................................................................................31

*Hutchins v. U.S. Dep't of Lab.*,
    683 F.3d 75 (4th Cir. 2012) ............................................................................................37, 38

*Journal Publ'g Co. v. Mechem*,
    801 F.2d 1233 (10th Cir. 1986) ..........................................................................................31

*Kelly v. Hegseth*,
    2026 WL 391777 (D.D.C. Feb. 12, 2026) ..........................................................................36

*Laber v. Harvey*,
    438 F.3d 404 (4th Cir. 2006) (en banc) ..............................................................................17

*Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cnty.*,
    149 F.3d 277 (4th Cir. 1998) ..............................................................................................34

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ..............................................................................................47

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................10, 11, 12, 16

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ................................................................................................3

*Matsumoto v. Labrador*,
    122 F.4th 787 (9th Cir. 2024) ............................................................................................24

vi

*McBurney v. Cuccinelli,*
  616 F.3d 393 (4th Cir. 2010) ...................................................................................20, 21

*McCullen v. Coakley,*
  573 U.S. 464 (2014)..................................................................................................44, 45

*Meese v. Keene,*
  481 U.S. 465 (1987)........................................................................................................15

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024)........................................................................................15, 39, 41

*In re Murphy-Brown, LLC,*
  907 F.3d 788 (4th Cir. 2018) ...................................................................................30, 47

*Mutafis v. Erie Ins. Exch.,*
  728 F.2d 672 (4th Cir. 1984) ...........................................................................................38

*N.Y. Times Co. v. Sullivan,*
  376 U.S. 254 (1964)....................................................................................................35, 36

*Nebraska Press Ass'n v. Stuart,*
  427 U.S. 539 (1976)............................................................................................19, 31, 47

*New Mexicans for Bill Richardson v. Gonzales,*
  64 F.3d 1495 (10th Cir. 1995) ...................................................................................18, 19

*Nutritional Health All. v. Shalala,*
  144 F.3d 220 (2d Cir. 1998)............................................................................................19

*Ohio Valley Env't Coal., Inc. v. Hernshaw Partners, LLC,*
  984 F. Supp. 2d 589 (S.D.W. Va. 2013)...........................................................................3, 17

*Ostergren v. McDonnell,*
  2008 WL 3895593 (E.D. Va. Aug. 22, 2008) ...................................................................19

*Ostergren v. Cuccinelli,*
  615 F.3d 263 (4th Cir. 2010) ...........................................................................19, 33, 42

*Overbey v. Mayor of Baltimore,*
  930 F.3d 215 (4th Cir. 2019) .......................................................................... *passim*

*Pennhurst State Sch. & Hosp. v Halderman,*
  465 U.S. 89 (1984)............................................................................................................21

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992)..........................................................................................................41

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)................................................................................................41, 44

*Reynolds v. Middleton*,
    779 F.3d 222 (4th Cir. 2015) .......................................................................3, 44, 45

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980)........................................................................................................39

*Richwine v. Matuszak*,
    707 F. Supp. 3d 782 (N.D. Ind. 2023) .....................................................................35

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    18 F.3d 269 (4th Cir. 1994) .................................................................................33, 34

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995)...............................................................................................33, 34

*Ross v. Early*,
    746 F.3d 546 (4th Cir. 2014) .....................................................................................45

*Rushford v. New Yorker Mag., Inc.*,
    846 F.2d 249 (4th Cir. 1988) .....................................................................................12

*S.C. Wildlife Fed'n v. Limehouse*,
    549 F.3d 324 (4th Cir. 2008) .................................................................................21, 25

*San Bernardino Cnty. Dep't of Public Social Servs. v. Superior Court*,
    232 Cal. App. 3d 188 (1991) .....................................................................................35

*In re Shain*,
    978 F.2d 850 (4th Cir. 1992) .....................................................................................13

*Silver Spurs, Inc. v. Town of Palm Shores*,
    1997 WL 809203 (M.D. Fla. Dec. 30, 1997)........................................................32

*Smith v. Daily Mail Publ'g Co.*,
    443 U.S. 97 (1979)...............................................................................................28, 34

*Soderberg v. Carrion*,
    999 F.3d 962 (4th Cir. 2021) ............................................................................. *passim*

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)........................................................................................................11

*Stephens v. Cnty. of Albemarle*,
    524 F.3d 485 (4th Cir. 2008) ..............................................................................12, 14, 16

*Stiltner v. Beretta U.S.A. Corp.*,
   74 F.3d 1473 (4th Cir. 1996) ..................................................................37

*Stone v. Univ. of Md. Med. Sys. Corp.*,
   855 F.2d 178 (4th Cir. 1988) ..................................................................12

*Susan B. Anthony List v. Driehaus*,
   814 F.3d 466 (6th Cir. 2016) .............................................................40, 41

*Telco Commc'ns, Inc. v. Carbaugh*,
   885 F.2d 1225 (4th Cir. 1989) ................................................................19

*Texas v. Johnson*,
   491 U.S. 397 (1989).................................................................................38

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*,
   450 U.S. 707 (1981).................................................................................34

*United States v. Amodeo*,
   71 F.3d 1044 (2d Cir. 1995)....................................................................47

*United States v. Blankenship*,
   79 F. Supp. 3d 613 (S.D. W. Va. 2015)............................................12, 14

*United States v. Dinwiddie*,
   885 F. Supp. 1286 (W.D. Mo. 1995) .......................................................37

*United States v. Miselis*,
   972 F.3d 518 (4th Cir. 2020) ...........................................39, 40, 41, 42

*Verizon Md., Inc. v. Public Serv. Com'n of Md.*,
   535 U.S. 635 (2002).................................................................................21

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988).................................................................................18

*In re Wall St. J.*,
   601 F. App'x 215 (4th Cir. 2015) (per curiam) ............................... *passim*

*Warth v. Seldin*,
   422 U.S. 490 (1975).................................................................................17

*Whole Women's Health v. Jackson*,
   595 U.S. 30 (2021)...................................................................................26

*Woodall v. Reno*,
   47 F.3d 656 (4th Cir. 1995) ....................................................................19

*Ex parte Young,*
    209 U.S. 123 (1908) ................................................................................ *passim*

*Zak v. Chelsea Therapeutics Int'l,*
    780 F.3d 597 (4th Cir. 2015) ............................................................................4

*Zeran v. AOL,*
    129 F.3d 327 (4th Cir. 1997) .....................................................................15, 40

**Statutes**

47 U.S.C. § 230 ..............................................................................................15, 40

Va. Code § 8.01-420.8 ........................................................................................87

Va. Code. § 17.292 .............................................................................................37

Va. Code § 17.1-293(E)(7) ...........................................................................1, 6, 24

Va. Code § 17.1-293(H) ................................................................................ *passim*

Va. Code § 17.1-314 ......................................................................................22, 24

Va. Code § 17.1-502(A) ..................................................................................22, 24

Va. Code § 59.1–443.2(A)(1) ..............................................................................33

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ....................................................1, 7, 20

Federal Rule of Civil Procedure 12(b)(6) ............................................................1

Federal Rule of Civil Procedure 15(a) ...............................................................17

## **INTRODUCTION**

The media have remote access to nonconfidential civil court records in federal courts and about 75 percent of the states and the District of Columbia.  Compl., ¶ 37.  While Virginia also provides remote access through "a system called 'Virginia Officer of the Court Remote Access' ('OCRA')," *Courthouse News Serv. v. Hade*, 580 F. Supp. 3d 289, 292 (E.D. Va. 2022) ("*Hade I*"), "OCRA is subject to two important statutory limitations," *id.*, that differ from other states.

First, the public and the press cannot use OCRA; only attorneys and government agencies.  Va. Code § 17.1-293(E)(7) (the "Access Restriction").  Second, Virginia imposes a prior restraint preventing OCRA users from disseminating any content in court records accessed through OCRA to "any third party" who may make them "available to the general public" – i.e., the press.  *Id.* § 17.1-293(H) (the "Dissemination Restriction").

One Plaintiff in this case, Courthouse News Service ("CNS"), initially sued Defendant Karl Hade, Executive Secretary of the Office of the Executive Secretary of the Virginia Supreme Court ("OES"), over both Restrictions.  Compl., ¶ 5 ("*CNS v. Hade*").  The Eastern District granted summary judgment against CNS after declining to apply strict scrutiny and finding both satisfied time, place and manner scrutiny.  *Courthouse News v. Hade*, 631 F. Supp. 3d 349 (E.D. Va. 2022) ("*Hade II*").  On appeal, a divided panel affirmed as to the Access Restriction but reversed as to the Dissemination Restriction on standing grounds, and that claim was dismissed without prejudice.  *Courthouse News Serv. v. Smith*, 126 F.4th 899 (4th Cir. 2025).

Defendant Hade and the three Defendant Clerks in this action are happy to tell the Court about *Hade II*, but their motions to dismiss are completely silent about *Hade I*, for good reason.  In *Hade I*, the Eastern District **denied** motions to dismiss under Rules 12(b)(1) and (b)(6) on the same sovereign immunity and merits grounds asserted here.  580 F. Supp. 3d at 295-96.

1

That is not all Defendants neglect to mention.  The list includes but is not limited to:

- The Fourth Circuit has instructed that both "'standing [and] ripeness requirements are … ***relaxed in First Amendment cases***.'"  *Edgar v. Haines*, 2 F.4th 298, 311 (4th Cir. 2021).[1]

- The Fourth Circuit has found the media – here, CNS and co-Plaintiffs Lee Enterprises and Lee BHM, Inc. ("Lee") – have standing based on their own "legally protected interest … to gather news," and ***"no merit"*** in Defendants' theory that it derives from "'the free speech rights of third parties.'"  *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 228 & n.11 (4th Cir. 2019).

- The Fourth Circuit has defined who "qualifies as a willing speaker" in a way that includes the OCRA subscriber in this case, who on multiple occasions told CNS and Lee he was "willing to provide information" to them, but did "not want to violate" OCRA.  *Id.* at 228.

- The Fourth Circuit has held that the discretion to deny OCRA access does not immunize Defendant Clerks from suit under the Eleventh Amendment, *Antrican v. Odom*, 290 F.3d 178, 191 (4th Cir. 2002), but constitutes a prior restraint in violation of the First Amendment.  *Am. Entertainers, LLC v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018).

- The Fourth Circuit has held a district court was "wrong" not to apply strict scrutiny to a restraint on the ground that it is not an "absolute" prohibition on dissemination of information available from other records.  *Soderberg v. Carrion*, 999 F.3d 962, 970 (4th Cir. 2021).

- The Fourth Circuit has held the Supreme Court "clarifie[d] what is necessary to carry the government's burden of proof under intermediate scrutiny," which now requires "***actual evidence***," *Reynolds v. Middleton*, 779 F.3d 222, 228, 231 (4th Cir. 2015); which Defendants cannot present on motions to dismiss and which varies here from the context in *Hade II*.

---

[1] All emphases in ***bold italics*** are added, those in *italics* only were in the original.  Citations for internal quotations, and parallel citations in quotations, are omitted unless otherwise noted.

These omissions all point to the same conclusion: CNS and Lee have plausibly alleged the Dissemination Restriction is unconstitutional.  So, Defendants instead attempt to make this case about something it's not.  They claim the Dissemination Restriction is necessary to protect confidential information from public disclosure, but that claim is entirely illusory.  By statute, the public records on OCRA are nonconfidential and do not contain confidential information.  Defendants in *Hade II* presented no evidence that the privacy concern they raise is actually implicated by OCRA itself (as opposed to other dissimilar systems), especially with respect to reporters contacting OCRA subscribers to request factual information about new filings.

The real concern in this case is that the "public's interest in monitoring the work of the courts is subverted'" by restraints on information available to the press.  *Doe v. Pub. Citizen*, 749 F.3d 246, 272-73 (4th Cir. 2014); *Overbey*, 930 F.3d at 227.  That "'damage can be particularly great when [a] prior restraint," like the Dissemination Restriction, "'falls upon the communication of news and commentary on current events,'" such as "'reports of public judicial proceedings.'"  *In re Charlotte Observer*, 921 F.2d 47, 49 (4th Cir. 1990).

CNS and Lee apologize for the length of this brief, but they had to address not only what Defendants omitted but also what they said.  Some arguments were unexpected because they were rejected in *Hade I* (sovereign immunity) or misread the Complaint (Lee Enterprises' alleged lack of standing).  If the Court prefers additional allegations on Defendants' enforcement of OCRA, Lee's standing or other points, CNS and Lee submit herewith a motion for leave to amend, which "should be freely given" as it would not "'be prejudicial to the opposing party,'" there has been no "'bad faith,'" and the amendment would "not be futile."  *Ohio Valley Env't Coal., Inc. v. Hernshaw Partners, LLC*, 984 F. Supp. 2d 589, 592 (S.D.W. Va. 2013) (quoting *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009)).

3

## BACKGROUND

In May 2024, while the appeal in *Smith* was pending in the Fourth Circuit, the court reporter for the *Richmond Times-Dispatch*, Luca Powell, learned a pleading had been filed on a Friday afternoon in a case Powell was covering in Dinwiddie County. Compl., ¶ 79.[2] Powell wanted to see the pleading so he could report about it to the *Times-Dispatch*'s readers, but Dinwiddie's Circuit Court is more than 50 miles away and would close before he could get there. *Id.* So he reached out to the *Times-Dispatch*'s attorney, David Lacy, to ask if Lacy could pull a copy off OCRA. *Id.* Due to the Dissemination Restriction, Lacy had to inform Powell he could not provide him anything from OCRA even if he had a subscription to OCRA for Dinwiddie. *Id.*

The *Times-Dispatch* is one of a dozen newspapers published by Lee in Virginia, Compl., ¶ 19, but Lee was not a party to *CNS v. Hade*. Had it been, *Smith* would have turned out differently; the two-judge majority vacated summary judgment against the Dissemination Restriction, and remanded for dismissal without prejudice, because the lone plaintiff, CNS, had "not identified anyone who would redistribute data from OCRA to [it] absent the Dissemination Restriction." *Smith*, 126 F.3d at 918. The only judge on the panel to reach the merits of the Dissemination Restriction found it to be "a prior restraint on speech" that was unconstitutional unless it could survive strict scrutiny on remand. *Id.* at 925 (Gregory, Circuit Judge, dissenting).

---

[2] This summary is drawn from facts the Court can consider at this stage, which includes "the allegations of the complaint itself," the "documents … attached to the complaint as exhibits," *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016), and "facts and documents subject to judicial notice." *Zak v. Chelsea Therapeutics Int'l*, 780 F.3d 597, 607 (4th Cir. 2015). The Court must "accept as true" the facts alleged in the complaint, *id.* at 601, and exhibits the complaint "has adopted as true." *Goines*, 822 F.3d at 167. These facts, and those "subject to judicial notice," must be "construed in the light most favorable to the plaintiff." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Evans v. United States*, 105 F.4th 606, 615 (4th Cir. 2024) (under Rule 12(b)(1), "where the defendant contends that the allegations in the complaint are insufficient to confer subject-matter jurisdiction, the district court assesses the motion under the same standard as one brought under 12(b)(6)"). .

4

**A.**     **OCRA's Restrictions Bar CNS and Lee From Reporting on Cases in Many Courts**

Lee is the fourth largest newspaper publisher in the United States, with 100,000 subscribers in Virginia alone.  Compl., ¶¶ 19, 45.  CNS is a nationwide news service that publishes reports about civil litigation in federal and state courts in all 50 states.  *Id.*., ¶ 29.  It has more than 2,200 subscribers, *id.*, ¶ 30, "including lawyers, law firms, news organizations, other media outlets, and entertainment and watchdog groups."  *Courthouse News Serv. v. Planet*, 947 F.3d 581, 585 (9th Cir. 2020) ("*Planet III*").  CNS serves "as a 'pool reporter' for national media, which disseminate CNS's litigation news to the broader public."  *Id.*  If CNS cannot obtain and report information about litigation in courts that are difficult to reach, "the expression of the newspapers, lawyers, libraries, and others who rely on CNS for information will also be stifled."  *Courthouse News Serv. v. Planet*, 750 F.3d 776, 788 (9th Cir. 2014) ("*Planet I*").

Among CNS' publications are its New Litigation Reports, which contain staff-written summaries of significant new civil complaints.  Compl., ¶ 30.  CNS publishes two New Litigation Reports in Virginia, the *Virginia Report* and *Southern Virginia State Report*.  *Id.*, ¶ 34.  Lee's 12 newspapers in Virginia also cover newsworthy civil litigation.  *Id.*, ¶¶ 19, 47-51.

CNS' reporters gather information for its news reports by visiting courts in person or online via PACER for federal courts or similar platforms now offered in most states.  Compl., ¶¶ 29, 36-37.  But covering courts in person or online is impossible for CNS and Lee in much of Virginia, turning many counties into "news deserts."  Compl., ¶¶ 39, 47-48, 71-73.  Courts are often in counties far from where reporters are based and the trip takes hours they do not have.  *Id.*, ¶¶ 38-42, 47-51.  It took three CNS journalists five days and 1,000 miles to reach 25 circuit courts.  Compl., Exh. 6 at 2.  And Virginia prevents its platform allowing online access from being used by journalists to report about civil litigation in remote courts.  Compl., ¶¶ 56-57.

5

**B.**       <u>**OCRA's Restrictions are Enforced by Defendant Hade and Defendant Clerks**</u>

At least 112 of Virginia's 120 circuit courts make civil court records available online through OCRA, which OES created and controls. Compl., ¶¶ 20, 53, 56 & 64. But journalists cannot use it to report on civil litigation. The Access Restriction limits access to "officers of the court" – attorneys and government agencies. Va. Code §§ 17.1-293(E)(7). The Dissemination Restriction prohibits those with access from "redistribut[ing] to any third party" any information in ***nonconfidential*** court records obtained from OCRA; while the statute allows attorneys with access to include content from OCRA "in products or services provided to a third party," none of that information may in turn be "made available to the general public." *Id.* § 17.1-293(H).

Defendants Hade, through OES, and the Clerks enforce these restrictions. Among other things, "the OCRA website, which Defendant Hade operates and maintains, states that OCRA 'is intended solely for the use of authorized Officer of the Court personnel ... and [a]ll other use is expressly prohibited.'" *Hade I*, 580 F. Supp. 3d at 295. Defendant Clerks require attorneys and agencies to sign a Subscriber Agreement for OCRA, the Terms and Conditions of which include, in identical language, an even stricter version of the Dissemination Restriction:

> Subscriber shall not permit any data accessed by secure remote access to be sold or posted on any other Internet website or in any way redistributed to any third party, and the clerk reserves the discretion to deny secure remote access to ensure compliance with this provision.

Compl., Exhs. 3, ¶ 8(e), 4 & 5, ¶ 6(e). An email produced in *CNS v. Hade* said OES created "the original version" of this Agreement's terms. Req. for Jud. Not. ("RJN"), Exh. 4; *see* Compl., ¶ 60 (alleging OES requires clerks to include this term). In courts CNS visited, clerks said "rules made by the Executive Secretary" controlled OCRA. Compl., Exh. 6 at 3. One clerk compared OES' OCRA software to "the Wizard of Oz" because "[i]t controls everything." *Id.* at 3, 9.

6

**C.        OCRA Restrains Subscribers from Providing Information to CNS and Lee**

In 2021, CNS sued Defendant Hade and Prince William County's Circuit Court Clerk in the Eastern District over the Access and Dissemination Restrictions.  Defendant Hade moved to dismiss on sovereign immunity grounds under Rule 12(b)(1) and both defendants sought dismissal on the merits under 12(b)(6).  The court denied both motions, *Hade I*, 580 F. Supp. 3d at 295-96, except to the extent it agreed to dismiss CNS' equal protection claim.  *Id.* at 297.

CNS later dismissed Hade without prejudice, and the Commonwealth intervened.  In September 2022, the court granted summary judgment for defendants on both the Access and Dissemination Restrictions.  *Hade II*, 631 F. Supp. 3d at 367-70.  It found both resembled time, place and manner regulations because CNS could access civil case records by traveling to courthouses.  *Id.* at 361, 368.  And it found intermediate scrutiny satisfied by defendant's interest in protecting "sensitive information" from "potential … data harvesting … by bots," *id.* at 358, 363-64, 369-70, even though Virginia requires parties to redact sensitive information such as Social Security and financial account numbers ***before*** filing.  Va. Code § 8.01-420.8.

On appeal, two judges affirmed as to the Access Restriction, but reversed on the Dissemination Restriction for lack of standing because CNS did not identify anyone willing to provide information from OCRA but for the Restriction.  *Smith*, 126 F.3d at 916-17.  The dissent would have reversed and remanded to apply strict scrutiny to both Restrictions.  *Id.* at 918-25.

After *Smith*, CNS and Lee asked Lacy on several more occasions to provide copies of complaints available on OCRA, or information from those records, such as the names of the parties, factual allegations or causes of action.  Each time, Lacy said he was willing to do so but for Dissemination Restriction, which prevented it.  Compl., ¶¶ 11-12, 43, 77-79 & 81-85.  In other states, attorneys often provide copies of court records to reporters.  *Id.*, ¶¶ 10 & 74.

7

**D.**    **Neither OCRA Nor CNS' CasePortal Contain Unredacted Sensitive Private Data**

Defendants say the Dissemination Restriction is intended to protect against disclosure of sensitive Personally Identifiable Information ("PII").  *See e.g.*, Defendant Hade Mem. of Law 13 (Dkt. 40) ("Hade Mem.") ("Virginia is regulating the ability of a lawyer with privileged access to a database of digital court files containing unredacted sensitive PII to disseminate those digital files to third parties."); *id*. at *id*. at 10 (restriction on dissemination "is a restriction on sharing unredacted digital court records that can contain information that is particularly vulnerable to exploitation"); Defendant Clerks Mem. in Supp. of Rule 12(b)(1) Motion 4-5 (Dkt. 42) ("Clerks' Mem I.") at 4, 5 (claiming attorneys can view unredacted records via remote access).

But no PII is available on OCRA, which contains only public, nonconfidential records – the same records available on public computer terminals at the courthouse.  That is because, by statute, circuit court clerks may provide remote access only to "nonconfidential court records." Va. Code Ann. § 17.1-225; § 17.1-293(E)(7) (clerks may provide "secure remote access to nonconfidential court records"); § 17.1-225 (clerks are "responsible for insuring that proper security measures are implemented and maintained to prevent remote access users from obtaining any data that are confidential under this Code").[3]  As a result, OCRA has no "unredacted digital court records" that contain sensitive PII.  Hade Mem. 10, Clerks' Mem. 4-5.

Similarly, CNS' subscribers cannot use CasePortal to "'download[] all the content from the clerk's [OCRA feed].'"  Hade Mem. 24 (quoting *Hade II*, 631 F. Supp. 3d at 370).  CNS does not put on CasePortal most complaints it reports on or confidential information, and it bars use of automated tools – such as "bots" – to mine CNS' content on CasePortal.  *See* Section V.

---

[3] Va. Code Ann. § 8.01-420.8 also requires that parties redact from civil pleadings all social security numbers, as well as the identification numbers from driver's licenses, credit cards, debit cards, bank accounts, or other electronic billing and payment systems before filing.

**I.**

## DEFENDANTS OVERLOOK CLEAR PRECEDENT HOLDING CNS AND LEE HAVE STANDING TO PROTECT THEIR FIRST AMENDMENT RIGHT TO GATHER NEWS

Trying in vain to shield their unconstitutional prior restraint from judicial review, Defendants overlook that "'First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing'" and therefore "'the Supreme Court has dispensed with rigid standing requirements.'" *Cooksey v. Futrell*, 721 F.3d 226, 235, 240 (4th Cir. 2013).

Moreover, the Fourth Circuit has rejected Defendants' theory that CNS and Lee "do not have standing to challenge the law's application to their own conduct." Hade Mem. 15; Clerks Mem. I 15. To the contrary, CNS and Lee have standing to sue over restrictions impairing their *own* First Amendment-protected "right to gather news." *Overbey*, 930 F.3d at 227 & n.11 (reversing dismissal on standing grounds). As *Overbey* illustrates, "[t]he doctrine of standing is well established" in this context: Where, as here, the case involves a statute or order "denying to [the media] access to potential sources of information," the media have "standing to maintain the present action and to challenge the validity of the restricti[on]." *CBS Inc. v. Young*, 522 F.2d 234, 237 (6th Cir. 1975) (per curiam); *see also Doe*, 749 F.3d at 262-63; *In re Wall St. J.*, 601 F. App'x 215, 218 (4th Cir. 2015) (per curiam).

As these cases show, the question is not whether CNS and Lee "can assert 'third-party standing,'" Clerks Mem. I 15, "derivative [of] Free Speech protections" for OCRA subscribers. Hade Mem. 20. *Overbey*, 930 F.3d at 227 n.11 (finding "no merit" in argument that media suing over restriction on a source "assert[ed] the free speech rights of third parties"). Rather, the question is whether the Dissemination Restriction has impaired the newsgathering rights of CNS and Lee in a way that can be redressed by a ruling in their favor. The question answers itself.

**A.**     **The Complaint Plausibly Alleges Injury to CNS and Lee the Court Can Redress**

To have standing, CNS and Lee need only show: "'(1) an injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision.'" *Overbey*, 930 F.3d at 226-27.

In this case, that showing is relaxed in two ways.  First, standing is "analyze[d] … differently depending on the stage of litigation at which the challenge is brought." *Id.* at 227.  At the pleading stage, the question is "whether [CNS' and Lee's] plausible allegations in the … Complaint, taken as true, are enough to give [them] constitutional standing." *Id.*  Second, "'when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.'" *Cooksey*, 721 F.3d at 235 (reversing dismissal where "[t]he district court erred … in not analyzing [Plaintiff]'s claims under the First Amendment standing framework").

While all three elements of the Article III standing analysis are therefore "'somewhat relaxed in First Amendment cases,'" *Edgar*, 2 F.4th at 310 (quoting *Cooksey*, 721 F.3d at 235), the "leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." *Cooksey*, 721 F.3d at 235.

**1.  Under Governing Precedent, CNS' and Lee's Newsgathering is Being Injured**

To determine that CNS and Lee have standing to sue over injuries to their own First Amendment rights, "[t]he crux of this issue is whether [they] ha[ve] alleged an injury in fact." *Overbey*, 930 F.3d at 227; *Doe*, 749 F.3d at 262 ("To satisfy the requirements for constitutional standing, the party invoking federal court jurisdiction must demonstrate 'that the conduct of which he complains has caused him to suffer an "injury in fact" that a favorable judgment will redress.'") (ultimately quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

"An injury in fact is 'an invasion of a legally protected interest that is concrete and

10

particularized and actual or imminent, not conjectural or hypothetical.'"  *Overbey*, 930 F.3d at

227 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan,* 504 U.S. at 560).

As the Sixth Circuit explained in holding that CBS had standing to challenge a "gag" order

restricting attorneys and other participants in a civil litigation over the Kent State shootings from

"discussing … these cases with members of the news media or the public," the legally protected

interest of CNS and Lee is their right "guaranteed … by the First Amendment" to "gather news."

*CBS*, 522 F.2d at 237-38 ("News gathering … qualifies for First Amendment protections"

because "'[w]ithout some protection for seeking out the news, freedom of the press could be

eviscerated'") (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)).

As the Sixth Circuit emphasized, that legally protected interest is invaded – i.e., "directly

impaired or curtailed" – even when the media is "not made a specific target of the restricti[on]"

if they are "effectively cut off" from access "to important sources of information" about, in that

case and this one, civil litigation.  *Id.* at 237-39 ("Although the news media are not directly

enjoined from discussing the case, it is apparent that ***significant and meaningful sources of***

***information*** concerning the case are ***effectively removed from them*** and their representatives.").

The Fourth Circuit follows the Sixth in recognizing media standing to challenge

restrictions on access to people or records with information about civil cases.  *Overbey*, 930 F.3d

at 226-30; *Wall St. J.*, 601 F. App'x at 218; *Doe*, 749 F.3d at 262-63.  This is hardly surprising

since the governing rules, which Defendants ignore, were set by the Supreme Court.

The initial Fourth Circuit precedent in this area addressed media standing to intervene

and appeal sealing orders.  *Doe*, 749 F.3d at 262-63 ("This Court has previously permitted news

organizations to intervene in actions in which they were not otherwise parties to challenge a

district court's sealing order" because "the news organizations' failure to obtain information" to

which they alleged a right of access "supplied the case or controversy necessary for the intervenors to secure appellate review") (citing *Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 178 (4th Cir. 1988); *Rushford v. New Yorker Mag., Inc.,* 846 F.2d 249, 252-54 (4th Cir. 1988)).

A district court applied *Doe* to find the media had standing to challenge a sealing and gag order barring counsel and trial participants from "mak[ing] any statements … or release[ing] any documents to the media or any other entity regarding the facts or substance of this case." *United States v. Blankenship*, 79 F. Supp. 3d 613, 616-17 (S.D. W. Va. 2015). In vacating that order, the Fourth Circuit agreed the media "meet the constitutional requirements for standing because their right under the First Amendment to gather news, *see Branzburg v. Hayes,* 408 U.S. 665, 681 (1972), and to receive speech from willing speakers, *see Stephens v. Cnty. of Albemarle,* 524 F.3d 485, 492 (4th Cir. 2008), has been directly impaired by the district court's order. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)." *Wall St. J.*, 601 F. App'x at 218.

The Fourth Circuit later applied *Branzburg* and *Stephens* to reverse dismissal on standing grounds of a claim by the Baltimore Brew, a "local news website that … investigates and reports on … allegations of police misconduct" and asserted a "policy of including non-disparagement clauses in its settlements with police-misconduct claimants violated the Brew's First Amendment interest in newsgathering." *Overbey*, 930 F.3d at 221 & 226-30. Recognizing that, when courts "evaluate standing based on the pleadings … 'we presume that general allegations embrace those specific facts that are necessary to support the claim,'" *id.* at 230 (quoting *Lujan*, 504 U.S. at 561), the Circuit held "the Brew has sufficiently alleged that the City's pervasive use [of] non-disparagement clauses in settlement agreements with police brutality claimants has interfered with its right to receive newsworthy information from willing speakers." *Id.* at 228-29.

As these cases make clear, CNS and Lee have standing on their own to seek to vindicate

12

their "legally protected interest … to gather news, which derives from the First Amendment."

*Id.* at 227 (citing *Branzburg* and *Food Line, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 520

(4th Cir. 1999) ("'There are First Amendment interests in newsgathering.'") (quoting *In re*

*Shain*, 978 F.2d 850, 855 (4th Cir. 1992) (Wilkinson, J., concurring)). The presence of a willing

speaker does not mean the media's standing derives from third-party rights, *id.* at 228 n.11, but

rather shows a ruling in their favor will redress the injury to their own right. *Id.* at 229-30.[4]

### 2.  The Complaint Alleges Attorneys Are Willing to Speak But For the Restriction

CNS and Lee have clearly alleged the Dissemination Restriction "interfered with [their]

right to receive newsworthy information from willing speakers." *Overbey*, 930 F.3d at 228-29.

To begin with, they allege that "[o]utside of Virginia, lawyers often provide journalists with

copies of court records so that the journalist can quickly access public pleadings without needing

to incur the time or expense of traveling to the courthouse to obtain a copy, or where access is

needed when the courthouse is closed (e.g., on nights and weekends)." Compl., ¶¶ 10 & 74

(Restriction prevents media from "relying on their legal counsel" or "other … lawyers" to

"provide them with potentially newsworthy complaints," a "common practice across newsrooms

---

[4] Defendants do not dispute the other standing elements, for good reason. "Once [CNS and Lee] clear[] the initial hurdle of injury-in-fact, [they] easily satisf[y] the other two elements of the standing inquiry, causation and redressibility." *Cooksey*, 721 F.3d at 238. In *Overbey*, the media "sufficiently pleaded an ongoing or imminent injury in fact that is both traceable to the City's challenged conduct and redressable by the court" even where "a significant amount of information about most claimants' lawsuits is available in the public record," because "some claimants' refusal to talk" had "a significant and deleterious effect on the Brew's reporting." 930 F.3d at 229-30. That same result must follow here. *Accord Edgar*, 2 F.4th at 311 ("plaintiffs' allegations also satisfy the causation and redressability elements" because "chilling of the plaintiffs' speech was plainly alleged to have been caused by the particular prepublication review regimes at issue" and a "favorable decision on the plaintiffs' behalf would deem the defendants' regimes unconstitutional and enjoin the defendants from enforcing them") (citing *Cooksey*, 721 F.3d at 238 ("causation is satisfied where 'a causal connection between the injury and the conduct complained of ... is "fairly traceable," and "not the result of the independent action of some third party not before the court"'" and "redressibility … is satisfied where there is 'a non-speculative likelihood that the injury would be redressed by a favorable judicial decision'")).

around the country"). Under *Overbey*, that is sufficient to infer a willing speaker. While "[t]his allegation is general, … it is plausible on its face" that, but for the Dissemination Restriction, attorneys in Virginia would be willing to give CNS and Lee the same information about new complaints they get from attorneys "[o]utside of Virginia." 930 F.3d at 230.

This general allegation is supported by specific allegations that Lee's attorney repeatedly told CNS' and Lee's journalists he was willing to give them information they wanted but for the Dissemination Restriction, which prevents him from providing copies of, or "any information" from, new complaints and other records on OCRA. Compl., ¶¶ 11-12, 43, 77-85. That is also sufficient to "allege that [the Restriction] has interfered with [CNS' and Lee's] right to receive newsworthy information from willing speakers." *Overbey*, 930 F.3d at 228-29. This is not a high bar, as illustrated by *Wall St. J.*, 601 F. App'x at 218 and *Blankenship*, 79 F. Supp. 3d at 616-19 (finding media standing based on broad assertion in motion to intervene that "'there exist willing speakers"') and the dearth of Fourth Circuit cases denying media standing to challenge restrictions on sources of information until *Smith*, where the issue was never briefed nor argued.[5]

Ignoring Fourth Circuit precedent, Defendants attempt to convert the willing speaker

---

[5] The only case *Smith* cited to impose the "willing speaker" requirement on CNS did ***not*** involve the media. 126 F.4th at 917. Rather, *Stephens* involved a widow suing for damages on the theory that non-disclosure agreements in settlements of environmental claims by neighbors of a landfill caused her husband's death in an explosion at the landfill years later. 524 F.3d at 486-87. The panel did not hold the widow's First Amendment claims were derivative (the words "derived" and "derivative" do not appear in the decision). Instead, it recognized plaintiff and her husband could "have suffered 'injuries in fact' – ***violations of their First Amendment right to receive information*** – that were caused by the speech restrictions," *id.* at 491, ***if*** she could show a "direct connection between [the neighbors] and [plaintiff] such that, absent the settlement agreements, [plaintiff] would expect to receive the information that [the neighbors] possessed." *Id.* at 492.

In the more recent case involving a media entity suing over denial of access to information caused by non-disclosure agreements, *Overbey* noted that, because the Brew had adequately alleged willing speakers, "this case does not require us to decide whether the news media's interest in newsgathering can be invaded when no willing speaker exists." 930 F.3d at 229 n.13.

14

standard into an insurmountable barrier to standing through a series of inapt arguments based on

a misreading of the precedent they cite and the theory, rejected by *Overbey*, that CNS' and Lee's

standing is derivative of OCRA subscribers.  For example, Defendant Clerks contend CNS and

Lee have no standing absent a "credible threat of imminent enforcement" against Lacy, ignoring

that the Restriction already prevents him from providing them information.[6]  Hade argues Lacy

does not qualify as a speaker under a tortured theory misapplying inapposite doctrines.[7]

    Neither theory has any application here.  "For the purposes of constitutional standing, a

---

[6]  Defendant Clerks also misapply the "'third-party' standing theory," Clerks Mem. I 22, and "'put the merits cart before the standing horse.'" *Cooksey*, 721 F.3d at 239.  First, the reason they have not "threatened to revoke Mr. Lacy's OCRA access," Clerks Mem. I 18, is because Lacy self-censored to comply with the Dissemination Restriction, thereby injuring CNS' and Lee's right to gather news.  Second, their theory that Lee and CNS have not been injured because the records are available at the courthouse, *id.* 19-21, goes to the merits of the underlying claim that the Restriction is a prior restraint even if it is a "partial ban." *Soderberg*, 999 F.3d at 969.  As "[t]he Supreme Court has explained, 'whether the statute in fact constitutes an abridgement of the plaintiff's freedom of speech is, of course, irrelevant to the standing analysis.'" *Cooksey*, 721 F.3d at 239 (quoting *Meese v. Keene,* 481 U.S. 465, 473 (1987)).  Finally, the argument that Lee's attorney cannot serve as its willing speaker ignores that Lacy is not CNS' attorney, rests on the assertion rejected in *Overbey* that CNS' and Lee's claim relies on "third party derivative standing," Clerks Mem. I 22, and misreads the case it cites, which held "the attorney-client relationship" ***does*** "satisfy[y] our requirements for *jus tertii* standing." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989).

[7]  *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), said ***nothing*** suggesting speakers are only protected "by publishing original work or by exercising editorial discretion."  Hade Mem. 19.  Addressing the narrow question of "whether ordering [an online platform] to provide a forum for someone else's views implicates the First Amendment," the Court said it does if "the regulated party is engaged in its own expressive activity," which includes, but is not limited to, "presenting a curated compilation of speech originally created by others." *Moody*, 603 U.S. at 728.

Like *Moody*, section 230 of the Communications Decency Act says ***nothing*** about who qualifies as a "'speak[er]' within the meaning of the First Amendment."  Hade Mem. 20.  Section 230 protects online platforms from liability "for information originating with a third-party user." *Zeran v. AOL*, 129 F.3d 327, 330 (4th Cir. 1997).  It says: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  It defines "information content provider" to include "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet." *Id.* § 230(f)(3).  The statute does not say who qualifies as a speaker under the First Amendment, but its definition of "information content provider" includes those providing information from court records available on OCRA.

person qualifies as a willing speaker if she would be willing to provide information on a matter of public significance to the news media but chooses not to because she does not want to violate a settlement agreement" or another restriction on their speech. *Overbey*, 930 F.3d at 228 (citing *ACLU v. Holder*, 673 F.3d 245, 255 (4th Cir. 2011) ("First Amendment … provides standing to persons who are 'willing listeners' to a willing speaker who, but for the restriction, would convey information."). Under Fourth Circuit law, CNS' and Lee's allegations more than suffice. *Overbey*, 930 F.3d at 228-29; *Holder*, 673 F.3d at 255 (plaintiff in *Stephens* "could have shown [a] direct connection" between "an identifiable willing speaker and herself as a willing listener" by showing speaker "would have spoken to her in the past but for the speech restriction").

**B.      Lee Enterprises' Harm From the Restriction Give It Standing as Well as Lee BHM**

The Complaint alleges Lee's Virginia newspapers were injured when they were unable to obtain information available on OCRA from an OCRA subscriber. Compl., ¶¶ 51, 72, 77-81, 85 & 89-90. Nonetheless, Defendant Hade contends Lee Enterprises lacks standing on the theory that the Complaint says only Lee BHM publishes the Virginia newspapers. Hade Mem. 7. But he misreads the Complaint, which defines both Lee plaintiffs collectively as "Lee," and alleges the collective "Lee" publishes the Virginia newspapers. Compl., ¶¶ 19 & 45.

At the pleading stage, that is sufficient. "This allegation is general, but it is plausible on its face. And when we evaluate standing based on the pleadings, … 'we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Overbey*, 930 F.3d at 230 (quoting *Lujan*, 504 U.S. at 561).

Moreover, it is accurate. The Complaint alleges the collective "Lee" publishes the Virginia newspapers because "both Lee entities are involved in publishing Lee's Virginia

16

newspapers." Decl. of S. Poulos, ¶ 4 (Ex. 1).[8] Contrary to Defendant's speculation that Lee's

Virginia reporters are employees of Lee BHM, Hade Mem. 7, in fact "the reporters and others

who work for Lee's Virginia newspapers are employees of Lee Enterprises." Poulos Decl., ¶ 4.

Lee BHM initially receives advertising and subscription revenue obtained by the Virginia

newspapers, but net profits from the Virginia newspapers flow to Lee Enterprises. *Id.*, ¶ 5.

Consequently, the First Amendment newsgathering injuries and financial injuries from the

Dissemination Restriction – from hiring more reporters to cover remote courts and/or losing

subscription revenue from readers at the edge of a newspaper's circulation area who cancel due

to lack of coverage of their courts – are borne by both Lee Enterprises and Lee BHM. *See id.*.

While a "parent corporation" has "a discrete corporate existence" and thus cannot rest its

standing on "[i]njury that arises *solely* out of harm done to a subsidiary corporation," both the

parent and the subsidiary have standing to sue where, as here, Defendants caused each "to suffer

some redressable injury to an enforceable legal right." *Classic Commc'ns, Inc. v. Rural Tel.

Serv. Co.*, 956 F. Supp. 896, 902 (D. Kan. 1996). "[D]rawing all reasonable inferences in favor

of [Lee], the court cannot say beyond doubt that plaintiffs can prove no set of facts connecting

[Lee Enterprises'] alleged harm to [Defendants'] challenged conduct." *Id.*

---

[8] The Court "may allow [or require] proof of standing" by "affidavits or other evidence."
*Carroll v. New People's Bank, Inc.*, 2018 WL 1659482, *1 n.2 (W.D. Va. Apr. 5, 2018) (citing
*Warth v. Seldin*, 422 U.S. 490, 501-02 (1975) (court "**ruling on a motion to dismiss for want of
standing** … must accept as true all material allegations of the complaint, and must construe the
complaint in favor of the complaining party," but "[a]t the same time, it is **within the trial
court's power to allow or to require** the plaintiff to supply, by **amendment to the complaint or
by affidavits**, further particularized allegations of fact deemed supportive of … standing")).

If the Court believes the Complaint needs to allege the facts set out in the Poulos Declaration to
support Lee Enterprises' standing, CNS and Lee have moved for leave pursuant to Federal Rule
of Civil Procedure 15(a) to submit an amended complaint doing so, which should be freely given
since the facts set out in the declaration show amendment would not be futile. *Ohio Valley Env't
Coal,* 984 F. Supp. 2d at 592-93; *see Laber v. Harvey*, 438 F.3d 404, 429 (4th Cir. 2006) (en
banc) (district court "abused its discretion" in denying motion to amend).

## II.

### THE AS-APPLIED CLAIM BY CNS AND LEE IS RIPE BECAUSE THE DISSEMINATION RESTRICTION CURRENTLY IMPAIRS NEWSGATHERING

Underscoring their fatal misunderstanding of First Amendment law, Defendant Clerks contend CNS' and Lee's as-applied claim is not ripe because they "fail[] to allege that any of the Clerks have revoked Mr. Lacy's OCRA access or that the Clerks have revoked anyone's access." Clerks Mem. I 27.  They overlook that the Fourth Circuit rejects the notion that First Amendment "claims are not ripe because [Defendants] ha[ve] taken no action against [a speaker]" where, as here, he must comply or face "'the threat of penalty.'" *Cooksey*, 721 F.3d at 240.

This conclusion flows from how ripeness is applied in this context.  Generally, the ripeness analysis considers "'[1] the "fitness of the issues for judicial decision" and [2] the "hardship to the parties of withholding court consideration."'" *Edgar*, 2 F.4th at 311 (brackets added).  But "'much like standing, ripeness requirements are also relaxed in First Amendment cases.'" *Id.*  "Indeed, 'First Amendment rights ... are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss.'" *Cooksey*, 721 F.3d at 240 (quoting *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1500 (10th Cir. 1995)).

In light of the "danger … of self-censorship," courts "are not troubled by the pre-enforcement nature of [a] suit.' *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Self-censorship here is not merely threatened but has occurred.  Lacy is compelled to "choose[] not to" provide information "because []he does not want to violate" the Dissemination Restriction.  *Overbey*, 930 F.3d at 228.  CNS' and Lee's as-applied claim that this Restriction "violate[s] their First Amendment right to gather and report the news" is ripe because it currently restricts their access to sources of information.  *Deep South Today v. Murrill*, 779 F. Supp. 3d 782, 796, 799-801 (M.D. La. 2025); *Flynt v. Rumsfeld*, 355 F.3d 697, 700-03 (D.C. Cir. 2004).

18

Unlike the authority cited by Defendants, CNS and Lee "'*do* … claim that they are presently subject'" to the Dissemination Restriction.  Clerks Mem. I 26 (quoting *Woodall v. Reno*, 47 F.3d 656, 658 (4th Cir. 1995).  "'[T]he legal issue presented is fit for judicial resolution'" as "[n]o further action from [Defendants] is needed."  *Cooksey*, 721 F.3d at 240-41.  The allegation that Lacy "declined to answer because of" the Restriction means the claim is ripe because CNS and Lee "had a right to listen to speech that was chilled."  *Democracy Rising PA v. Celluci*, 603 F. Supp. 2d 780, 793-94 (M.D. Pa. 2009), *aff'd*, 380 F. App'x 155 (3d Cir. 2010).

For similar reasons, "the cost to" is too high to "delay[] judicial review."  *Ostergren v. McDonnell*, 2008 WL 3895593, *5 (E.D. Va. Aug. 22, 2008), *aff'd sub nom. Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010).  CNS and Lee should not be required to "face [the] significant impediment" to their right to gather news from "delay[ed] consideration."  *Cooksey*, 721 F.3d at 240 ("'In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.'") (quoting *Gonzales*, 64 F.3d at 1500) (reversing ruling that claim was not ripe where "the statute has a direct and immediate effect on [plaintiff's] exercise of his First Amendment liberties").[9]

---

[9]  The Dissemination Restriction impairs CNS' and Lee's newsgathering because it is "impossible for Plaintiffs' reporters to regularly drive to each [OCRA] court" to obtain records, so they are "forced to forego coverage of newsworthy cases in remote courts they would have informed the public about but for OCRA's restrictions."  Compl., ¶¶ 69-72.  Contrary to Clerks Mem. I 26, challenges to the "prior restraint" in OCRA are "clearly ripe," *Nutritional Health All. v. Shalala*, 144 F.3d 220, 227 (2d Cir. 1998), because "a 'prior restraint'" not only "chills speech, but … 'freezes' it," *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1233 (4th Cir. 1989) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)).  Immediate review is important given Defendants' "discretion" to decide whether to revoke OCRA access if a subscriber violates the Restriction, Clerk Mem. I 4, as a "scheme that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990) (quoting *City of Lakewood v. Plain Dealer Pub'g Co.,* 486 U.S. 750, 757 (1988)).  In Defendants' cases, the claims were not ripe because no prior restraint had issued.  *Woodall*, 47 F.3d at 658; *Bruce & Tanya & Assocs. v. Bd. of Supervisors of Fairfax Cty.*, 854 F. App'x 521 (4th Cir. 2021).

19

**III.**

**DEFENDANTS' ELEVENTH AMENDMENT "ENFORCEMENT" ARGUMENTS
FARE NO BETTER AT THIS PLEADING STAGE THAN THEY DID IN *HADE I***

Although they do not acknowledge it, Defendants' Eleventh Amendment arguments rest largely on the same theory – purported lack of enforcement authority over the Dissemination Restriction – that Defendant Hade made and lost in *Hade I*.  At this pleading stage, this Court should reject these arguments for the same reason Judge Hudson rejected it at the pleading stage in *Hade I*: "CNS [and Lee] ha[ve] adequately alleged that [the Defendants] maintain[] a 'special relation' to the challenged policy and ha[ve] 'acted or threatened' to enforce it."  580 F. Supp. 3d at 295 (quoting *McBurney v. Cuccinelli*, 616 F.3d 393, 402 (4th Cir. 2010)).

Defendant Hade's argument here is virtually identical to the one he made in *Hade I* – a purported lack of a "special relation" or enforcement of the Dissemination Restriction on the part of him or his office, OES – and it fails for the same reasons it did in *Hade I*: at the motion to dismiss stage, the Complaint adequately alleges the predicates for *Ex parte Young*, 209 U.S. 123 (1908).  As for the Defendant Clerks, they argue that because the penalty they may impose for violation of the Dissemination Restriction (revoking OCRA access) is discretionary, and *Ex parte Young* "does not apply to 'the exercise of the discretion' of a state official," Clerks' Mem. I 11, 13, they also lack the requisite enforcement authority.  But Defendant Clerks do not understand that their discretion is not a virtue but a vice in in the context of a First Amendment case like this one, and their attempt to escape the *Ex parte Young* doctrine similarly fails.

**A.**     **Defendant Hade's Eleventh Amendment Ignores *Hade I* as Well as CNS' and Lee's Factual Allegations Here That Are More Than Sufficient at This Pleading Stage**

In *Hade I*, Defendant Hade sought dismissal under Federal Rule of Civil Procedure 12(b)(1) on the same argument he asserts here: his claim that "he has no special relation to the challenged statutes here and never acted or threatened to enforce them."  *Hade I*, 580 F. Supp. 3d

at 294; *cf.* Hade Mem. 9-10.  In January 2022, Judge Hudson denied his motion to dismiss, observing that CNS' complaint adequately alleged the requirements to fit within the "expansive exception to sovereign immunity where state officers may be sued in their official capacity when the plaintiff is only seeking prospective injunctive relief to remedy the enforcement of an unconstitutional statute." *Hade I*, 580 F. Supp. 3d at 294.  This exception, set forth by the Supreme Court in *Ex parte Young*, "has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v Halderman*, 465 U.S. 89, 105 (1984).[10]

Under *Ex parte Young*, an action seeking to enjoin a state official's ongoing violation of federal law is not barred by the Eleventh Amendment for an important reason: if his conduct violates federal law, the state cannot cloak his actions with state authority or immunity.  209 U.S. at 159-60.  "To fit within the exception, the officer must have a 'special relation' to the challenged policy or statute;[11] and (2) the officer must have 'acted or threatened'[12] to enforce the policy or statute.'"  *Hade I*, 580 F. Supp. 3d at 294 (quoting *McBurney*, 616 F.3d at 402).

Hade's Eleventh Amendment argument fails to even acknowledge the *Hade I* ruling. Instead, it reads as if *Hade I* does not exist: Hade reargues, as he did in *Hade I*, that he lacks a "special relation" to the Dissemination Restriction and claims that CNS and Lee "cannot show"

---

[10] "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md., Inc. v. Public Serv. Com'n of Md.*, 535 U.S. 635, 646 (2002).

[11] This requirement "is not met when an official merely possesses "[g]eneral authority to enforce the laws of the state." *McBurney*, 616 F.3d at 399.  Rather, the relationship must be "qualitatively special …. This requirement ensures that a federal injunction will be effective with respect to the underlying claim." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008).  The measure of the relationship is the "proximity to and responsibility for the challenged state action." *McBurney*, 616 F.3d at 399.

[12] Enforcement "authority can come from 'the particular act' being challenged, a more general law providing enforcement authority, or 'the general duties of the officer.'" *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021) (quoting *Ex parte Young*, 209 U.S. at 158).

21

that he "has 'acted or threatened to enforce any policies related to OCRA access." Hade Mem. 9.

As in *Hade I*, the complaint here "contains many factual allegations to the contrary." 580 F. Supp. 3d at 294. It alleges Hade's agency, OES, created and exerts almost total control over OCRA. As Executive Secretary, Hade is "'the court administrator for the Commonwealth,' Va. Code § 17.1-314, which includes serving as 'the administrator of the circuit court system.' Va. Code § 17.1-502(A)." Compl. ¶ 20. "OES created, and now supports and maintains, a Case Imaging System ("CIS") that enables participating circuit courts … to create and store electronic images of case documents." *Id.* ¶ 53. "OES also created, and now supports and maintains, OCRA, which is an application developed by OES for circuit clerks that use CIS." *Id.* OES "provides and maintains" the OCRA login page. *Id.* ¶ 64. "The Executive Secretary provides maintenance and technical support for the OCRA platform for those Virginia circuit courts … that pay for this support and utilize OCRA," and charges clerks an annual maintenance fee of up to $9,500. OES bills $1.2 million to circuit court clerks annually for maintenance fees. *Id.* ¶¶ 20, 53.

The Complaint also alleges OES requires clerks to include the Dissemination Restriction – and language indemnifying OES – in their OCRA subscription agreements. Compl. ¶ 60. That allegation is supported by email produced in *CNS v. Hade* showing OES created the agreements, including the "disclaimer," from exemplars, which it "modified" for OCRA, RJN, Exh. 4,[13] and the control OES asserted over a Work Group convened to examine the possibility of opening OCRA to the public, which resulted in a November 2018 report by Defendant Hade. *Id.*, Exh. 3.

That report was "prepared in response to … language in the 2018 Appropriation Act" stating that the "Executive Secretary shall convene a working group, to include a minimum of

---

[13] This and other documents produced in *CNS v. Hade* are also submitted in support of the motion for leave to file an amended complaint that CNS and Lee file herewith.

five circuit clerks, to evaluate issues related to the statewide adoption of electronic filing of civil cases in circuit courts, and the implementation of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system." *Id*. at 1.  As the report shows, membership of the Work Group included seven OES staff members, *id*. at 14, and, read in full, the report confirms the extent to which OES and Virgina circuit court clerks, including the clerks in this case (Defendants Jewett and Flannagan were on the Work Group with OES), collaborate with one another on OCRA and its restrictions.

It is also illustrated by the allegations that "the OCRA website, which Defendant Hade operates and maintains, states that OCRA 'is intended solely for the use of authorized Officer of the Court personnel … and [a]ll other use is expressly prohibited.'" *Hade I*, 580 F. Supp. 3d at 295; Compl. ¶ 64 & Exh. 2 ¶ 40.  Thus, "even if CNS received permission from the circuit court clerk to access OCRA, it would still be confronted with this overt warning that, since its employees are not attorneys, its access is 'expressly prohibited.'" *Hade I*, 580 F. Supp. 3d at 295.

Indeed, when CNS journalists visited the Lee County Circuit Court in September 2022 as part of trip to 25 Virginia Circuit Courts over five days and more than 1,000 miles, the Lee Clerk "tentatively agreed to allow [CNS Bureau Chief Ryan] Abbott to sign up for OCRA online."  But the OCRA subscriber interface – controlled by OES – requires a bar number or an "Authorized Officer of the Court" number to review court records on OCRA.  Having neither, Abbott was unable to use it.  Compl., Exh. 6, at 7; *see* RJN, Exh. 1 (OCRA login page).  In that instance, it was OES – and not the Lee Circuit Clerk – that effectively enforced the OCRA restrictions.

*Hade I* also noted that "an OES employee, in response to a deposition question, stated that it has "always been [OES'] stance that the [Va. Code] does not support providing [OCRA] to anyone other than members of the bar."  580 F. Supp. 3d at 295.  This Court may take judicial

23

notice of the same page of the same deposition testimony, in which the OES deponent went on to testify that the restriction than an OCRA user "[m]ust be a member in good standing of the Virginia State Bar" was "*an OES-imposed requirement*."  RJN Exh. 2 (Depo. Trans. 98).

These allegations, and *Hade I*'s conclusion, of OES' and Defendant Hade's role in imposing and enforcing the Access Restriction apply equally to the Dissemination Restriction, which was also at issue in *Hade I*.  As Defendant asserts, enforcement of the Dissemination Restriction is part and parcel of enforcement of the Access Restriction.  Hade Mem. 23 ("this Dissemination Restriction is necessary to prevent attorneys from bypassing the access restriction contained in Code § 17.1-293(E)(7)"); 22 ("Dissemination Restriction closes a loophole").

Ignoring all this, Defendant claims he "lacks a 'special relation' to the challenged Dissemination Restriction because "Virginia circuit court clerks possess exclusive statutory authority to enforce the Dissemination Restriction."  Hade Mem. 9.  But he cites no authority to support this bald assertion of exclusive statutory control.  And "even accepting Defendant Hade's argument that he does not have unilateral control over court records inside of OCRA," *Hade I*, 580 F. Supp. 3d at 295 – since clerks have "legal custody" of the records, Hade Mem. 9 – *Ex Parte Young* does not require the defendant be the *only* official with a relationship and an enforcement role.  *Matsumoto v. Labrador*, 122 F.4th 787, 803 (9th Cir. 2024) ("defendant's enforcement role need not be exclusive to make that defendant proper under *Ex parte Young*").

*Hade I* rejected this argument for good reason: the allegations in the complaint, the statute and OCRA's website contradict it.  580 F. Supp. 3d at 294; *see* Compl., ¶¶ 20, 60, 64, Exh. 2 ¶¶ 35, 38, 40, 59; Va. Code §§ 17.1-314 & -502(A).  That conclusion is buttressed by Exhibit 6 to the Complaint.  During CNS' 2022 tour of 25 Virginia circuit courts, many clerks spoke of OES control over OCRA and its restrictions.  When CNS' reporters asked the Bristol

24

Clerk what remedy they had for her denial of their request for OCRA access, she told them:

"Contact OES to figure it out."  Compl., Exh. 6 at 8.  At the Wythe County Circuit Court, the

clerk described OES OCRA software as "like the Wizard of Oz.  It controls everything."  *Id*. at 9.

All told, the Complaint and its exhibits include more than enough to plausibly allege that

Defendant Hade's OES has sufficient control over OCRA to allow him "'to enforce, if he so

chooses, the [Dissemination Restriction],'" Hade Mem. 9 (quoting *Doyle v. Hogan*, 1 F.4th 249,

255 (4th Cir. 2021)), and that OES has, at the very least, "threatened" to enforce that restriction.

*Id*.   Indeed, even if it is a clerk that directs OES to terminate an OCRA subscriber for violation

of the Dissemination Restriction, it would certainly be OES that carries out the punishment, and

"[a]s the administrative head of [OES] with responsibility for carrying out its policies and

representing the agency in its dealings with the federal government, [Defendant Hade] possesses

a sufficient connection to the alleged violation of federal law."  *S.C. Wildlife Fed'n v.

Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008).  Even accepting as true OES' contention that it

"does not in any way evaluate or screen potential subscribers once the clerk determines they are

authorized," Hade Mem. 10 (quoting Compl., Exh. 2, ¶ 41), the allegations in the complaint, if

true, establish "a federal injunction with be effective" as to Hade.  *Limehouse*, 549 F.3d at 333.

**B.**     **The Defendant Clerks Enforcement Argument Misunderstands How "Discretion"**
           **Is Relevant For *Ex Parte Young* Purposes In This First Amendment Case**

The Complaint contains particularized allegations regarding the OCRA Subscriber

Agreements used by each Defendant Clerk, each of whom incorporated the Dissemination

Restriction into their Agreements.  Compl. ¶¶ 58-59 & Exh. 3 ¶ 8(e) (Richmond); Exh. 4 ¶ 6(e)

(Roanoke); Exh. 5 ¶ 6(e) (Bristol).  All three Agreements provide that OCRA access may be

denied, and the agreement terminated, for failure to comply with those terms.  Compl. Exhs. 3 ¶¶

8(e) & 15(b), 4 ¶ 6(e) & 14, 5 ¶ 6(e) & 14.  This alone is enough for Defendant Clerks to satisfy

25

the "special relation" and "enforcement" requirements of *Ex Parte Young*.  They therefore try a different tack; they claim to lack the requisite enforcement authority because they cannot disbar attorneys and their power to revoke OCRA access is "discretionary."  Clerks Mem. I 10-14.

This position reflects a grievous misunderstanding of the relevance of a state defendant's discretion in the context of *Ex Parte Young* in a First Amendment case like this one.  Simply put, it cannot be that the same "unbridled discretion" which shows that the Dissemination Restriction is an unconstitutional "prior restraint," *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988), also immunizes them from suit over that restraint.  And it is not.

What Defendant Clerks overlook is that, while "the *Ex parte Young* doctrine does not allow the courts to interfere with their discretionary acts," that doctrine "does not extend this rule to preclude judicial review of discretionary acts that violate federal law." *Elephant Butte Irr. Dist. v. Dep't of Interior*, 160 F.3d 602, 611 (10th Cir. 1998) (citing *Ex parte Young*,  209 U.S. at 158-59 ("holding the state officials' 'general discretion regarding the enforcement of the laws ... is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment, to the injury of the complainant'")); *accord, e.g., Antrican*, 290 F.3d at 191 (defendants' *Ex parte Young* "argument lacks merit because the Medicaid Act does not provide participating States with discretion to deny dental screening and treatment as specified in the Act").[14]

---

[14] Defendant Clerks' reliance on *Whole Women's Health v. Jackson*, 595 U.S. 30, (2021), for the proposition that the *Ex parte Young* exception "does not normally permit federal courts to issue injunctions against state-court judges or clerks," is equally misplaced.  Mem. I 11.  Plaintiffs there sought "an order enjoining all state-court clerks from docketing" Texas "Heartbeat Act" abortion cases "and all state-court judges from hearing them."  595 U.S. at 39.  Thus, while the general proposition the Defendant Clerks recite may be correct, that is because "[*u]sually*, those individuals ***do not enforce state laws as executive officials might; instead, they work to resolve disputes between parties.***"  That is not the case here, as the Eighth Circuit held in rejecting the same argument in *Courthouse News Serv. v. Gilmer*, 48 F.4th 908, 911-13 (8th Cir. 2022).

Put another way, Defendant Clerks concede that *Ex parte Young* allows CNS and Lee to asset a claim "seek[ing] prospective injunctive relief to enjoin a state official's ministerial enforcement, or threatened enforcement, of a state statute or authority."  Clerks Mem. I 11; *Ex parte Young*, 209 U.S. at 158.  The ministerial duty here is implementation of OCRA, and they have no discretion to implement it in a way that violates the First Amendment.  Consequently, "[a]n injunction to prevent [them] from doing that which [they] ha[ve] no legal right to do is not an interference with the discretion of an officer."  *Ex parte Young*, 209 U.S. at 159.  Just so, the injunctive relief sought by CNS and Lee seeks "only an order that State officials 'comply with federal law,' not how to use their discretion in complying."  *Antrican*, 290 F.3d at 191.[15]

Their alternate argument that CNS and Lee failed to adequately allege the requisite threat of enforcement, Clerks Mem. I 12-14, completely misses the point.  Enforcement of the Dissemination Restriction does not require authority to disbar an attorney for violating it.  *See id.* It simply requires that Defendant Clerks require OCRA users to sign a Subscriber Agreement imposing the Dissemination Restriction in its terms, and threatening sanctions for non-compliance, which is what their Agreements do.  Compl., Exhs. 3, ¶ 8(e), 4, ¶ 6(e) & 5, ¶ 6(e). Their successful enforcement is illustrated by the fact that they have not had to "threaten[] … to revoke Mr. Lacy's OCRA access for sharing electronic court records with the Plaintiffs," Clerks Mem. I 13, as it shows he is self-censoring, and has not shared any electronic court records with CNS or Lee, because he is compelled to comply with the Restriction to avoid revocation.[16]

---

[15] Even cursory review of the complaint reveals CNS and Lee do not allege the Defendant Clerks are "'fail[ing] to properly train and supervise the [deputy clerks],'" acts that "plainly involve the exercise of discretion."  *Brooks v. St. Charles Hotel Operating, LLC.*, 2023 WL 6244612, *12 (D. Md. Sept. 26, 2023).  Their reliance on *Brooks* is therefore misplaced.  Clerks Mem. I 11, 13.

[16] Nor is there any merit to Defendant Clerks' contention that CNS and Lee did not adequately plead "an actual subscriber agreement between the Clerks and Mr. Lacy," Clerks Mem. 13, as review of the Complaint also makes perfectly clear.  Compl. ¶¶ 11-12, 43, 77, 79, 83.

**IV.**

**THE DISSEMINATION RESTRICTION IS A RESTRAINT ON PROTECTED SPEECH ABOUT CIVIL COURT RECORDS ON OCRA THAT IMPAIRS NEWSGATHERING, AND THUS IS UNCONSTITUTIONAL UNLESS IT SATISFIES STRICT SCRUTINY**

Defendants contend the Dissemination Restriction is not a prior restraint on the ground that it is not an absolute ban on disseminating information from civil court records. Hade Mem. 22; Clerks Mem. in Supp. of Rule 12(b)(6) Motion 11 ("Mem. II"). But they never address Fourth Circuit authority rejecting that very theory in holding that another "district court was wrong to apply intermediate scrutiny, rather than strict scrutiny." *Soderberg*, 999 F.3d at 970.

Defendants twist themselves into pretzels trying to deny the Dissemination Restriction is a prior restraint. They argue the Restriction does not do what it says – i.e., "does not prohibit speech before it occurs" – but "only provides a consequence after speech." Clerks Mem. II 9; Hade Mem. 10-13. But this is a distinction without a difference: "[I]t [i]s 'not dispositive' whether the challenged … statute [i]s 'view[ed] as a prior restraint or as a [post-speech] sanction'" because both "'require[] the highest form of state interest.'" *Soderberg*, 999 F.3d at 968 n.3 (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 101-02 (1979)). Moreover, they concede that consequence is at the clerks' "unbridled discretion," which alone "constitutes a prior restraint." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

In *Smith,* Judge Gregory – the only member of the panel to address the merits of the Dissemination Restriction – found it to be a prior restraint under *Soderberg*. 126 F.4th at 925. And even if that Restriction is not subject to strict scrutiny for that reason, it is for another: any "inhibition of press news-gathering rights must be necessitated 'by a compelling governmental interest, and ... narrowly tailored to serve that interest.'" *In re Express-News,* 695 F.2d 807, 808-09 (5th Cir. 1982) (quoting *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607 (1982)).

28

**A.      Strict Scrutiny Applies to Restraints on Disseminating Content from Court Records**

The district court in *Hade II* said the Dissemination Restriction "resembles a 'time, place and manner' restriction" on the ground that it is not an absolute ban because "the access restriction merely prevents information from such records *obtained electronically* from being sold, posted, or distributed to third parties." 631 F. Supp. 3d at 368. Defendants repeat that same argument here, Hade Mem. 22, in so many words. Clerks Mem. II 11-14.

As Judge Gregory explained, this theory was plainly wrong when applied to media seeking access to OCRA to inform the public about civil complaints available on OCRA. *Smith*, 126 F.4th at 925-26 (Gregory, Circuit Judge, dissenting) (citing, e.g., *Soderberg*, 999 F.3d at 966-68). It is equally misguided here, where CNS and Lee seek to vindicate their First Amendment-protected right to gather and report about newsworthy information in public court records available on OCRA filed in courts too remote for CNS and Lee to travel to, or filed when a reporter cannot make it to court (such as close to deadline or when the courthouse is closed).

**1. *Soderberg* Requires that District Courts Apply Strict Scrutiny Even to Partial Bans On Disseminating Information Obtained from Publicly Available Court Records**

Neither *Hade II* nor Defendants mention *Soderberg*, in which the Fourth Circuit reversed another district court that used the same theory as *Hade II* to avoid applying strict scrutiny.

*Soderberg* involved a Maryland statute that included a "Broadcast Ban" prohibiting dissemination only of electronic recordings of criminal proceedings. 999 F.3d at 964-65. The district court adopted the state's theory that strict scrutiny "applies only to absolute prohibitions on the publication of information in any form," not where "the same information" could be obtained from other court records or by watching "what occurred during the proceedings." *Id.* at 966. The district court said "a partial ban" was a restriction on the method of dissemination subject only to intermediate scrutiny as a time, place and manner restriction. *Id.* at 969.

29

The Fourth Circuit said this ruling was "belied" by *Daily Mail* – the case cited by *Hade I* and Defendant – "which involved a partial ban on the publication of information." *Soderberg*, 999 F.3d at 969. "Rather than treating the limited nature of the ban as a reason to subject it to intermediate scrutiny as a time, place and manner regulation, [*Daily Mail*] considered it to be significant to the applicable strict scrutiny analysis and fatal to the constitutionality of the statute." *Id.* Consequently, the Fourth Circuit held "the district court was wrong to apply intermediate scrutiny, rather than strict scrutiny." *Id.* at 970

Contrary to Defendant Clerks' theory that "[a] prior restraint … does not apply to restrictions on disclosures of information accessible by other means," Clerks Mem. II 11, it is often the case that restrictions on speech about civil litigation, such as gag orders, involve only a partial ban that does not prohibit providing the press the information by other means, such as by providing copies of, or information in, public records filed in the case. *See, e.g., In re Murphy-Brown, LLC*, 907 F.3d 788, 793 (4th Cir. 2018) (gag order allowed attorneys and other "covered individuals" to discuss "'information contained in the public record of this case'"); *CBS*, 522 F.2d at 236. Despite their partial nature, these "gag orders are prior restraints" ***on those subject to them*** – "[l]ike ***all*** 'court orders that actually forbid speech activities.'" *Murphy-Brown*, 907 F.3d at 797 (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)).

This is also true of a statute or policy that "'prohibits … disseminating ***digital*** recordings of criminal court proceedings'" even though the identical information can be gleaned from other records. *Soderberg*, 999 F.3d at 965-66 & n.3. All are subject to strict scrutiny. *Id.*

2. **Strict Scrutiny Applies to Restraints on Speaking with the Media about Civil Cases**

Strict scrutiny applies regardless of whether the media are directly subject to a restraint or their newsgathering is "directly impaired" by a prior restraint imposed on attorneys from whom it seeks to gather information. *CBS*, 522 F.2d at 238; *compare Express-News*, 695 F.2d at 808-

30

09 (ordering press not to interview jurors failed strict scrutiny) *with Journal Publ'g Co. v. Mechem*, 801 F.2d 1233, 1235 (10th Cir. 1986) (ordering jurors to "not discuss your verdict" failed strict scrutiny because it "effectively prohibit[ed] [the press] from interviewing jurors" and "any inhibitions against news coverage of a trial carry a heavy presumption of an unconstitutional prior restraint" unless "necessitated by a compelling governmental interest").

"An order prohibiting extrajudicial comments by counsel constitutes a prior restraint on the right to gather news and derivatively on publication." *Connecticut Mag. v. Moraghan*, 676 F. Supp. 38, 42 (D. Conn. 1987) (citing *Journal Publ'g,* 801 F.2d at 1236)). Even where it "does not directly restrict the speech or publication of [the press], it does impede its ability to gather news by listening to and reporting on the out-of-court statements of counsel …. Prior restraints are of particular concern under the first amendment, and therefore must be approached with special caution." *Id.* (citing *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976)).[17]

Perhaps aware that cases like *CBS* and *Wall Street Journal* invalidated prior restraints restricting what attorneys can say to the press when challenged by the press, Defendants contend the Dissemination Restriction "is not a prior restraint" on the speech of attorneys on the ground that it "does not require a license or pre-approval for attorneys with OCRA access to speak. At most, if the attorney is found to be downloading and selling the digital court records to third

---

[17] A case cited by Defendant Clerks – which held "the news agencies **have standing** to appeal [an] order restraining speech of the trial participants," *In re Dow Jones & Co.*, 842 F.2d 603, 608 (2d Cir. 1998) – applied a lower standard to a gag order requested by counsel in a criminal case because grand jury leaks created "a 'reasonable likelihood' that pretrial publicity will prejudice a fair trial." *Id.* at 610. The Fourth Circuit has not addressed *Dow Jones*, but has indicated it would follow *CBS*. In vacating a gag order challenged by the media, the Circuit cited *Nebraska Press*, which *Connecticut Mag.* cited to support following *CBS*. *Wall St. J.*, 601 F. App'x at 218-19. And in holding a Virginia restriction on attorneys' comments about their own pending cases was constitutional in criminal cases but violated the First Amendment in civil cases, the Circuit cited *CBS*, noting that the "gag on lawyers during [that] civil trial was reversed because the order infringed the first amendment." *Hirschkop v. Snead*, 594 F.2d 356, 373 (4th Cir. 1979).

parties, a clerk may choose in their discretion to revoke the attorney's access to OCRA," which

Defendants claim "is not punitive." Hade Mem. 14; *see* Clerks Mem. II 2, 5.[18]

But Defendants' concession that OCRA gives clerks discretion is fatal to their argument. "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint." *Lakewood*, 486 U.S. at 757. This is one of "'two evils that will not be tolerated in [licensing] schemes.'" *Am. Entertainers, LLC v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018) (the other is "'fail[ing] to place limits on the time … [to] issue the license'''").

Even where "issuance of the license is ministerial," a statute allowing government to "suspend or absolutely revoke the license" with "no safeguards governing" exercise of that discretion creates the "kind of subjective and arbitrary power [that] cannot withstand constitutional scrutiny." *Silver Spurs, Inc. v. Town of Palm Shores*, 1997 WL 809203, *3 (M.D. Fla. Dec. 30, 1997). This is also true of statutes, like OCRA that require subscribers to "periodically renew [their] license." *Lakewood,* 486 U.S. at 759. The vice in a law that "contains no explicit limits on the [Clerk's] discretion" – giving them "unfettered discretion" to decide whether to revoke or deny renewal of OCRA access to a subscriber who provides information to the press – is that it "gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech." *Id.* at 759, 769.

---

[18] After telling the Eastern District that violating the Dissemination Restriction could subject attorneys to discipline, including "'suspension or revocation of his or her license,'" to support the Access Restriction, Compl., ¶ 61 n.1 (quoting *CNS v. Hade*, ECF Doc. 67 at 16-17), Hade's counsel should not now be heard to say the Dissemination Restriction is "not punitive." Hade Mem. 14. The Dissemination Restriction does "punish" some members of the "public [for] publishing" information from OCRA, contrary to the conclusion in *Hade II*, 631 F. Supp. 3d at 368, repeated here. Hade Mem. 22. In any event, it does not matter "whether the [Restriction] [i]s 'view[ed] as a prior restraint or as a penal sanction.'" *Soderberg*, 999 F.3d at 968 n.3.

It is far from unfathomable that a clerk may use this unchecked discretion not to revoke OCRA access of an attorney who provides information to a reporter for a favorable article on, say, a lawsuit by the Commonwealth, but revoke OCRA access for an attorney who provides information for an article criticizing the Commonwealth or a clerk. Indeed, something similar has happened before. *Ostergren*, 615 F.3d at 266, 268-73, 286-87 (holding unconstitutional Commonwealth's prosecution of plaintiff's "advocacy website" for its "political speech" in posting unredacted land records – to "criticize[]" Virginia "clerks of court" for placing those records online without redacting social security numbers – under a statute banning dissemination of "another's individual social security number to the general public'").[19]

**B.    Defendants' Arguments for Not Applying Any Scrutiny to the Restriction All Fail**

Unable to even attempt to argue the Dissemination Restriction survives strict scrutiny, and apparently aware the square peg of the time, place and manner scrutiny applied to the Access Restriction in *Hade II* does not fit the round hole of the Dissemination Restriction (as CNS and Lee will explain in Section V), Defendants try to assert a handful of arguments why the Court should not apply any scrutiny to the Dissemination Restriction, none of which have merit.

**1.   Contractual Waivers of Constitutional Rights Do Not Apply to Statutory Restraints**

To take Defendant Hade's final argument first, contractual waiver of First Amendment rights does not apply to prior restraints imposed by statute. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 18 F.3d 269 (4th Cir. 1994), *rev'd*, 515 U.S. 819 (1995). In the only case cited by Defendant, "waiver of constitutional rights" was applied to "an otherwise valid contract

---

[19]  The Virginia statute originally exempted from its prohibition SSNs contained in "'records required by law to be open to the public,'" which would include unredacted land records. *Ostergren*, 615 F.3d at 269 (quoting Va. Code § 59.1–443.2(A)(1)). In her effort to spur a change in the law and clerks' practices, plaintiff posted unredacted land records of Virginia clerks of court and other public officials, after which the exemption was removed from the law and the Attorney General announced plaintiff would be prosecuted. *Id.* at 269 & n.5, 288-89.

with the government" that was not used to enforce a statutory restraint. *Overbey*, 930 F.3d at 223.  It has not been applied when the "challenge is to the [government's] regulation" of speech, even where it may be enforced through a "standard agreement." *Rosenberger*, 515 U.S. at 823.

In *Rosenberger*, the "regulation" involved University of Virginia "Guidelines" for student groups. *Id.* at 823-24.  An agreement each group signed was "'the only source of any control the University may have over the [group] or its activities.'" *Id.* at 849 (O'Connor, J., concurring).  The Fourth Circuit said the issue was "whether [the Guidelines] are imposing an unconstitutional condition upon the exercise of the plaintiffs' protected speech." *Rosenberger*, 18 F.3d at 280.  By "erect[ing] … a prior restraint'" on funding a student publication due to its religious content, the Guidelines were unconstitutional unless "'necessary to serve a compelling state interest and is narrowly drawn to achieve that end.'" *Id.* at 280-81.[20]  The Supreme Court agreed analytically but found the restraint was not necessary to "comply[] with the Constitution's prohibition against state establishment of religion." *Rosenberger*, 515 U.S. at 828, 831, 837.

*Rosenberger* did not address contractual waiver, and it is inconceivable the high court would have upheld the statutory restraints in prior cases even if the media were required to sign a contract agreeing to comply in exchange for access to proceedings or information.[21]  Indeed,

---

[20] Conditions on receipt of a government benefit requiring sacrifice of a First Amendment right must by justified "by showing that it is the least restrictive means of achieving some compelling state interest." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981). When one court applied this "unconstitutional condition" doctrine to a contract between a city and its fire department, the Fourth Circuit reversed and applied "waiver" analysis, including the balancing test used in *Overbey*, which it took from public employee speech case involving an independent contractor.  *Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cnty.*, 149 F.3d 277, 280-82 (4th Cir. 1998) (applying *Board of Cnty Comm'rs v. Umbehr,* 518 U.S. 668 (1996)).

[21] *See Soderberg*, 930 F.3d at 967-69 & n.3 (citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975) (First Amendment barred privacy claim based on Georgia law prohibiting publication of name of rape victim where reporter obtained the information from court records lawfully obtained) and *Daily Mail*, 443 U.S. at 98-100 (striking down West Virginia statute prohibiting publication of names of youths charged as juvenile offenders without court approval)).

other courts have held exactly that.[22]

Even if a Subscriber Agreement incorporating the statutory Dissemination Restriction could be considered a contractual waiver, it will not be enforced where the interests supporting waiver "are outweighed by strong policy interests that are rooted in the First Amendment." *Overbey*, 930 F.3d at 223.  Defendant Hade notes this rule, but overlooks that, given the "'profound'" First Amendment interests at stake, the Fourth Circuit refused to enforce a waiver because defendant had "not identified a comparably *compelling* public good" justifying enforcement.  *Id.* at 223-26 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).[23]

Neither *Smith* nor Defendant Hade in relying on that decision articulate a "compelling public good" justifying enforcement of the alleged waiver because the threat posited to justify the Access Restriction – automated "bots" mining the OCRA database to scrap any PII in the court records there, *Smith*, 126 F.3d at 911-12 – does not exist with respect to the individual records, or the public information in those records, that an attorney may want to disseminate or be asked to provide the media so they can report it to the public.  *See also infra* Section V.

---

[22] *See, e.g., Baltimore Sun Co. v. State*, 667 A.2d 166, 173 (Md. App. 1995) ("'portion of the order conditioning [press] attendance … upon their agreeing in advance not to publish the name of the juvenile is … an unconstitutional prior restraint'"); *San Bernardino Cnty. Dep't of Public Social Servs. v. Superior Court*, 232 Cal. App. 3d 188 (1991) (First Amendment prohibited juvenile court from "imposing [as] conditions of access" a prior restraint on publishing certain information in reports about proceeding).

[23] In addition, courts "do not presume that the waiver of a constitutional right … is enforceable." *Overbey*, 930 F.3d at 223.  "In the civil no less than the criminal area, courts indulge every reasonable presumption against waiver" of "fundamental rights."  *Fuentes v. Shevin,* 407 U.S. 67, 94 n.31 (1972).  This in turn requires Defendant to show the waiver was "made knowingly and voluntarily," *Overbey*, 930 F.3d at 223, which he cannot do. The OCRA "[a]greement does not mention [subscribers'] rights under the federal Constitution," let alone explain that but for the Dissemination Restriction the subscribers would have a "First Amendment" right to inform others about the public court records on OCRA that they waive by signing.  *Richwine v. Matuszak*, 707 F. Supp. 3d 782, 794 (N.D. Ind. 2023), *aff'd,* 148 F.4th 942 (7th Cir. 2025).  And it is difficult to see how a provision required by statute can be considered voluntary.

Even if that asserted interest exists at some limited level in this context, it is clearly outweighed by the "'profound national commitment'" – which lies "at the heart of the First Amendment" – "'to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Overbey*, 930 F.3d at 223-24 (quoting *Times v. Sullivan*, 376 U.S. at 270)). Dissemination of information about newsworthy complaints and other court records "allow[s] the public to understand the parties involved in a case, the facts alleged, the issues for trial, and the relief sought," and is "'an essential component'" in that debate, *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 327 (4th Cir. 2021) (quoting *Globe Newspaper,* 457 U.S. at 606), because it "is crucial to 'not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary.'" *Id.* (quoting *Doe*, 749 F.3d at 266).

Consequently, enforcement of the alleged "waiver of [OCRA subscribers'] First Amendment rights … cuts against strong public interests that are highly relevant to the very right that [the subscribers purportedly] waived," and should be denied. *Overbey*, 930 F.3d at 226.

**2.  <u>The Court Must Decline Defendants' Plea to Ignore the Plain Text of the Restriction</u>**

Defendant Hade implores the Court to overlook the plain language of section 17.1-293(H) and consider "'the design of the statute as a whole and its object and policy,'" Hade Mem. 10-11 (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990)), which, he contends, shows that the Dissemination Restriction "is a restraint on conduct, not speech." *Id.* at 10.

To quote a recent decision in another First Amendment context, "Horsefeathers!" *Kelly v. Hegseth*, 2026 WL 391777, *10 (D.D.C. Feb. 12, 2026). The rules on statutory interpretation are clear: "Analysis properly begins with the language of the statute itself," and only when its "ordinary meaning" is "ambiguous" are courts "left … to give it the meaning most consistent with the statute's purpose." *In re Andrews*, 80 F.3d 906, 909 (4th Cir. 1996) (citing *Crandon*, 494 U.S. at 158); *Faircloth v. Lundy Packing Co.,* 91 F.3d 648, 653 (4th Cir. 1996) ("If the

36

statutory language is clear and unambiguous, our inquiry ends there as well; we neither resort to

an examination of the statute's legislative history nor apply the traditional rules of statutory

construction.") (citing *Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1482 (4th Cir. 1996)).

In this case, the statute at issue is clear and unambiguous on its face:

> Nothing in this section shall be construed to permit ***any data*** accessed by secure remote access to be sold or posted on any other website or ***in any way redistributed to any third party***, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, ***the data accessed*** by secure remote access ***may be included in products or services provided to a third party*** of the subscriber provided that (i) ***such data is not made available to the general public*** and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

Va. Code § 17.1-293(H).[24]

"Data" is not defined in the statute. *See id.* § 17.292(B). "[W]here a word is not defined

by statute, the Court normally construe[s] it in accord with its ordinary or natural meaning," and

it "'customarily turn[s] to dictionaries for help in determining whether a word in a statute has a

plain or common meaning.'" *Hutchins v. U.S. Dep't of Lab.*, 683 F.3d 75, 77 (4th Cir. 2012).

As dictionary definitions demonstrate, "[t]oday, data is used in English both as a plural

noun meaning 'facts or pieces of information' (*These data are described more fully elsewhere*)

and as a singular mass noun meaning 'information' (*Not much data is available on flood control*

*in Brazil*)." Dictionary.com/browse/data (Usage). Data most broadly means "facts or

information, especially when examined and used to find out things or to make decisions,"

---

[24] Defendant Clerks ask the Court to ignore what the statute says by claiming prior restraints are limited to "a narrow set of regulations" that do not include a statute prohibiting dissemination on information from OCRA to third parties and the public. Clerks Mem. II 9. But "[a] prior restraint may take many forms" not included in the Clerks' list. *Dirks v. Bd. of Cnty. Comm'rs.*, 2016 WL 2989240, *5 n.47 (D. Kan. May 24, 2016); *see Alexander*, 509 U.S. at 569. Restraints such as OCRA "that actually forbid speech activities" are not limited to "[c]ourt orders and injunctions." Clerks Mem. II 9. "A prior restraint is generally any governmental action that would prevent a communication from reaching the public." *United States v. Dinwiddie*, 885 F. Supp. 1286, 1298 (W.D. Mo. 1995), *aff'd and remanded*, 76 F.3d 913 (8th Cir. 1996).

Oxfordlearnersdictionaries.com/us/definition/english/data, and secondarily "information that is stored by a computer." *Id.*; Dictionary.com/browse/data (data is "information in digital format," or "a body of facts, information," or "individual facts, statistics, or items of information.").

Defendant's attempt to rewrite the statute thus fails because it cannot be limited to "a restriction on ***downloading data*** from an OCRA database and disseminating it" when what Defendant means is sharing of "'Personally Identifiable Information (PII)" in "unredacted digital court records." Hade Mem. 10-11. "If the General Assembly of Virginia had intended to" limit section 17.1-293(H) to downloading and sharing of PII in unredacted digital records "it could have easily said so." *In re Callaway*, 1978 WL 222036, *3 (Bankr. E.D. Va. Oct. 26, 1978).

It most certainly would not have said that no "data" may be "in any way redistributed to any third party." As Defendant concedes, this Restriction prohibits "disseminating it to third parties," Hade Mem. 10, which includes telling a reporter over the phone the contents of court records or emailing a copy. *See Mutafis v. Erie Ins. Exch.*, 728 F.2d 672, 674 (4th Cir. 1984) (statute recognized "disseminating" may be accomplished via "any oral or written statement").

Moreover, by asserting the Dissemination Restriction is a "restraint on conduct," Hade Mem. 10, Defendant concedes the game because the conduct here ***is*** speech. "Speech for First Amendment purposes includes 'the spoken or written word' as well as 'conduct [that] possesses sufficient communicative elements," including "dissemination of information." *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1227-28 (10th Cir. 2021) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). That includes providing reporters information about civil court records so they can "report on whatever newsworthy content they contain," and the Dissemination Restriction's restraint on that speech "portends particularly egregious damage to First Amendment rights because it stifles the 'free discussion of governmental affairs' that the First Amendment exists to

protect." *Planet I*, 750 F.3d at 787-88 (9th Cir. 2014) (quoting *Globe Newspaper*, 457 U.S. at 604); *Schaefer*, 2 F.4th at 327 ("openness of the judicial process – especially through the press's reporting – 'affords citizens a form of legal education and hopefully promotes confidence in the fair administration of justice'") (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980)); *Ostregren*, 615 F.3d at 268-72 (First Amendment protects posting "land records containing unredacted SSNs online" to "publicize her message that governments are mishandling SSNs and generate pressure for reform").

Even if the statute was ambiguous – and, as shown, it is not – Defendant Hade cites no other part of the statute that supports reading the Restriction as limited to prohibiting dissemination of unredacted court records with PII.  All he cites is the description of defendant's arguments in *Smith* about data mining ***in other remote access systems*** dissimilar to OCRA (as they neither require a subscription agreement nor redaction of PII by filers) to justify the interest served ***by the Access Restriction*** to prevent "'easy access to large volumes of data'" – a court's OCRA database– that "'bots programmed to seek personal information can quickly search,'" which "'[d]ata mining typically requires.'"  126 F.4th at 911 (quoting Commonwealth brief).

Whatever the merits of this argument with respect to the Access Restriction, it does not even remotely suggest the clear terms of the Dissemination Restriction could be read as limited to restraining distribution of PII.  Rather, it establishes the Restriction is manifestly overbroad.

### 3.  CNS and Lee Have Stated Both Facial and As Applied Claims

Defendants' contentions that CNS and Lee have not stated a facial challenge to the Dissemination Restriction "rest on a serious misunderstanding of First Amendment precedent and principle." *Moody v. NetChoice, LLC*, 603 U.S. 707, 727 (2024) (cited at Hade Mem. 19).

The case Defendants rely on explains one reason why the "so-called overbreadth doctrine" does not apply here. *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020); *see*

Hade Mem. 13; Clerks Mem. II 14-15. This "doctrine 'allows a party to challenge a law facially under the First Amendment by "describing a substantial number of instances of arguable overbreadth of the contested law," even *if the law is constitutional as applied to [himself]*.'" *Miselis*, 972 F.3d at 530. Consequently, "the 'usual judicial practice' is to determine that the statute 'would be valid as applied' to the challenger's own conduct before proceeding to a facial challenge premised on the hypothetical conduct of others 'unnecessarily.'" *Id.*

As shown above, Defendant Hade's objections to the as-applied claim are without merit: CNS and Lee *do* have standing to challenge impairment of their right to gather news; that right is impaired by the restraint on OCRA subscribers' ability to provide information; and subscribers' speech is protected by the First Amendment whether or not they are also an "information content providers" under section 230 of the CDA. *Compare* Hade Mem. 15 & 18-21 *with Overbey*, 930 F.3d at 228-29; *Zeran v. AOL*, 129 F.3d 327, 330 (4th Cir. 1997); *supra* Section I.A.1-2 & n.7.

Even if CNS and Lee could not bring an "as applied" challenge – and, as shown, they can – the substantial overbreadth doctrine has not been applied to "certain speech prohibitions" that are "presumptively unconstitutional," as to which the only question is whether they survive constitutional scrutiny. *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016). Those prohibitions include "content-based restrictions," *id.*, and "traditional types of prior restraint," *Citizens United v. Schneiderman*, 882 F.3d 374, 386-87 (2d Cir. 2018), such as statutes barring speech or providing discretion to deny or revoke a license for speech activity. *Id.*; *Dirks v. Bd. of Cnty. Comm'rs of Ford Cnty.*, 2016 WL 2989240, *5 n.46 (D. Kan. May 24, 2016) ("licensing and censorship schemes [are] classic forms of prior restraint").

The Dissemination Restriction combines both forms of prior restraint. As to the first, it is unconstitutional unless it survives strict scrutiny, and Defendant has not attempted to show it

40

can.  *Soderberg*, 999 F.3d at 970 (4th Cir. 2021) (after reversing use of intermediate scrutiny,

Fourth Circuit remanded to apply strict scrutiny with no discussion of overbreadth); *see R.A.V. v.*

*City of St. Paul*, 505 U.S. 377, 381 (1992) ("ordinance is facially unconstitutional in that it

prohibits otherwise permitted speech solely on the basis of the subjects the speech addresses").[25]

As to the second, the Restriction is invalid because "the face of the ordinance itself contains no

explicit limits on the [clerk's] discretion."  *Lakewood*, 486 U.S. at 769.  No further analysis is

required.  *Am. Entertainers*, 888 F.3d at 720-21 (reversing holding that ordinance "confer[ring]

too much discretion" was not a prior restraint and remanding for entry of judgment).[26]

Even if the facial challenge to the Dissemination Restriction is subject to the overbreadth

doctrine, Defendants' own arguments show "the [Restriction] 'prohibits a substantial amount of

protected speech relative to its plainly legitimate sweep.'"  *Moody*, 603 U.S. at 723-24.

Defendant contends the legitimate sweep of the Dissemination Restriction "is not [to]

restrict[] any speech, only the downloading and dissemination of digital copies of court records

---

[25] Although the Court need not reach this issue to deny the motions to dismiss, CNS and Lee
note that the Dissemination Restriction is also content-based. A "speech regulation targeted at
specific subject matter is content based even if it does not discriminate among viewpoints within
that subject matter."  *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015).  The Dissemination
Restriction is a content-based "'prohibition of public discussion of an entire topic,'" *id.* – civil
court records available on OCRA – even though "it impose[s] no limits on the political
viewpoints that could be expressed."  *Id.*  "Content-based laws 'are presumptively
unconstitutional and may be justified only if the government proves that they are narrowly
tailored to serve compelling state interests.'"  *Susan B. Anthony List*, 814 F.3d at 473 (Ohio law
prohibiting false statements about political candidates during election season an unconstitutional
content-based restriction "focused on a specific subject matter") (quoting *Reed*, 576 U.S. at 163).

[26] In cases challenging an entire statutory scheme where the reviewing courts only held
provisions imposing a prior restraint unconstitutional, those courts remanded for determination
of whether the unconstitutional provisions were severable or whether the entire ordinance needed
to be invalidated.  *Lakewood*, 486 U.S. at 772; *Am. Entertainers*, 888 F.3d at 723-24.  Contrary
to what Defendant Hade suggests, severability analysis is not an impediment to holding the
Dissemination Restriction facially unconstitutional, Hade Mem. 16, but would simply identifies
whether "the appropriate remedy is to invalidate the statute only to the extent that it reaches too
far, while leaving the remainder intact."  *Miselis*, 972 F.3d at 530.

41

containing sensitive PII that has not been redacted to third parties." Hade Mem. 16. Setting

aside that posting public records that contain PII – and there was no showing in *CNS v. Hade* that

civil records on OCRA do, as Virginia requires redaction of most sensitive PII before filing – can

be protected speech, *Ostergren*, 615 F.3d at 272, the Restriction is not nearly so limited. Instead,

it "sweeps up a substantial amount of protected [speech]." *Miselis*, 972 F.3d at 541.

The Dissemination Restriction does not just ban disseminating digital copies of records

with PII; it also bans disseminating copies of court records that never contained PII or from

which PII was redacted, and disseminating any information in those records – even if provided in

an oral or written summary about the parties, factual allegations and causes of action – to any

third party who might disseminate it to the public. Compl., ¶¶ 10-12, 43-44 & 77-85. *All* of that

constitutes First Amendment-protected speech that "allows the public to 'participate in and serve

as a check upon the judicial process." *Schaefer*, 2 F.4th at 327 (quoting *Globe Newspaper,* 457

U.S. at 606). None of it implicates Defendant's asserted legitimate sweep. "Altogether, these

areas of overbreadth cover the whole realm of [speech] that [*Schaefer* and the First Amendment]

protects, and dwarfs that which [is] … unprotected." *Miselis*, 972 F.3d at 541.[27]

---

[27] Defendant Clerks cite *no cases* even suggesting that media challenging a restraint on sources of information need to "show 'willing' attorneys in a 'substantial number' of instances." Clerks Mem. II 15. That is because whether "a 'willing speaker' exists" is part of the "standing" analysis, *Overbey*, 930 F.3d at 228, while the merits of facial challenge involves "'a substantial number of instances of arguable overbreadth,'" *Miselis*, 972 F.3d at 530, and never the twain should meet. "Courts 'must not confuse standing with the merits.'" *Ass'n of Am. Railroads v. Hudson*, 144 F.4th 582, 589 (4th Cir. 2025). Even if a court could combine "willing speaker" and the substantive "overbreadth doctrine,'" *id.*, CNS and Lee have more than plausibly alleged a substantial number of willing speakers, as they have alleged that "across the country" attorneys provided journalists with copies of court records, which attorneys within Virginia have said they were also willing to do "[o]n multiple occasions" but for OCRA. Compl., ¶¶ 10, 74, 90.

42

**V.**

## DEFENDANTS DO NOT ARGUE THE DISSEMINATION RESTRICTION SURVIVES STRICT SCRUTINY AND THE SCRUTINY THEY APPLY REQUIRES FACTUAL EVIDENCE THEY HAVE NOT AND CANNOT PRESENT AT THIS STAGE

The "reasoning of the overturned *Hade* decision" on summary judgment, Hade Mem. 22, cannot apply here because the context is different.  Perhaps the "'precise question'" if CNS had access to OCRA was "'whether the First Amendment provides Plaintiff, as a member of the public, a right to sell, post, and redistribute information obtained from *electronic* civil court records while it may already sell, post, and redistribute information obtained *physically* from the courthouse.'"  *Id.* (quoting *Hade II*, 631 F. Supp. 3d at 368).  But that is not the question now.

Rather, the question is whether the government can prohibit those with access from providing any information in nonconfidential public records on OCRA to the press if they are also available at that courthouse (which may be too remote for most people to reach).  The answer, *Soderberg* said, is "no."  The First Amendment requires strict scrutiny of a statutory restraint banning dissemination of "'truthful information'" – such as parties' names, factual allegations and causes of action – "'disclosed in public court documents'" on OCRA even if "the Ban … does not limit other means of disseminating the same information."  *Soderberg*, 999 F.3d at 966-68 (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495-96 (1975)).

Defendants do not argue the Dissemination Restriction meets strict scrutiny, for good reason.  They cannot show it is "'need[ed] to further a state interest of the highest order'" and "'narrowly tailored to [that] state interest.'"  *Id.* at 969; *Ostregren*, 615 F.3d at 267, 276 & 286-87 (clerks' failure to redact SSNs before making records available via "secure remote access" meant statute prohibiting publication of SSNs was not narrowly tailored to protect state interest of the highest order).  Consequently, their motions should be denied.

The same result follows if the Restriction is viewed as a content-neutral time, place and

43

manner regulation, especially on a motion to dismiss given "'the rigorous and fact-intensive nature of intermediate scrutiny's narrow-tailoring analysis'" requires "'the government [must] present *actual evidence* supporting its assertion[s].'" *Billups v. City of Charleston*, 194 F. Supp. 3d 452, 471 (D.S.C. 2016) (denying dismissal) (quoting *Bruni v. City of Pittsburgh*, 824 F.3d 353, 372 (3d Cir. 2016) (reversing dismissal) and *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (reversing summary judgment)).

Indeed, *Hade I* denied a motion to dismiss on this ground.  580 F. Supp. 3d at 296.[28]

The two-judge majority in *Smith* did not address the merits of the Dissemination Restriction or *Hade II*'s application of time, place and manner scrutiny to it.  The northstar for this analysis, then, becomes "the Supreme Court's recent decision" on time, place and manner scrutiny – *McCullen v. Coakley*, 573 U.S. 464 (2014) – which "clarifie[d what is necessary to carry the government's burden of proof under intermediate scrutiny." *Reynolds*, 779 F.3d at 228.

Under *McCullen,* "'intermediate scrutiny ... *require[s]* the government to present *actual evidence* supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden.'" *Billups v. City of Charleston, S.C.*, 961 F.3d 673, 687 (4th Cir. 2020). Defendant Hade does not address this "evidentiary showing required of a governmental entity seeking to uphold a speech restriction under intermediate scrutiny," *Reynolds*, 779 F.3d at 232, nor explain how it can be satisfied at the pleading stage.

Instead, he contends "the Dissemination Restriction does not burden substantially more

---

[28] *Hade II* erred in concluding the Dissemination Restriction is content-neutral if it was not imposed "'because of disagreement with the message [speech] conveys.'" 631 F. Supp. 3d at 361.  As the Supreme Court has held, a ban on "'public discussion of an entire topic'" is content based even if it is viewpoint (i.e., message) neutral.  *Reed*, 576 U.S. at 169; *see supra* at 41 n.25.

speech than necessary because it applies only to records obtained electronically and not records obtained physically at the courthouse." Hade Mem. 23-24 (citing *Hade II*, 631 F. Supp. 3d at 370) (following *Ross v. Early*, 746 F.3d 546, 557 (4th Cir. 2014), decided ***before** McCullen*).

Whatever the merits of that conclusion if the Access Restriction had been invalidated and CNS had access to a court's OCRA database, it cannot suffice here, where "the [Dissemination Restriction] ***burdens*** a wide range of protected speech," *Reynolds*, 779 F.3d at 230 – all speech about any information in court records on OCRA – particularly when the press cannot travel to the courthouse. It is also manifestly insufficient after *McCullen*, under which proving the Restriction "'does not burden substantially more speech than necessary'" – i.e., "'the burden of proving narrow tailoring'" – "'requires the [government] to *prove* that it actually *tried* other methods to address the problem'" and did so "***before*** enacting the speech-restricting law." *Billups*, 961 F.3d at 687-88 (4th Cir. 2020) (quoting *Reynolds*, 779 F.3d at 229, 231).

*Hade II* did not discuss any evidence showing Virginia tried relying on any alternatives – such as redaction by filers or agreements prohibiting data mining – to prevent disclosure of PII that are less restrictive before banning all dissemination of information from OCRA. *Hade II* thus cannot support dismissal here because the Commonwealth there "had 'not shown that it seriously undertook to address the problem with less intrusive tools readily available to it. Nor ha[d] it shown that it considered different methods that other jurisdictions have found effective.'" *Billups*, 961 F.3d at 688 (quoting *McCullen*, 573 U.S. at 494).[29]

---

[29] In Texas, CNS did not need to hire an attorney to "exploit[]" a "loophole," Hade Mem. 22, because remote access there is not "restricted" to attorneys, *id.* at 20, but open to all. Https://research.txcourts.gov/CourtRecordsSearch/Home#!/howToGetAccess ("General Public" under "Register"). Texas successfully prohibits "[d]ata scrapping," https://research.txcourts.gov/CourtRecordsSearch/Assets/site/termsAndConditions/TX_TermsAndConditions.html, and the *Hade I* defendants offered no evidence this restriction failed to work.

45

Nor did *Hade II* discuss evidence that CNS' subscribers used CasePortal to download, exploit or sell content from OCRA, Hade Mem. 24, a false theory the Commonwealth raised for the first time at the summary judgment hearing.  That may be why *Hade II* mistakenly thought there "would be nothing stopping" this outcome but for the Access Restriction.  631 F. Supp.3d at 365.  In actuality, CasePortal is a web-based interface used by CNS' subscribers to view and manage docket sheets and alerts, and to access and download CNS' daily reports to which they subscribe.  *CNS v. Hade*, Doc. 89 at 63-64.  CNS does not download complaints or any other court filings "in a mass way" to "resell it through their website."  *Id.* at 65; *cf. id.* at 40 & 47.

Moreover, CNS' Terms of Use bar such misuse of CasePortal or any use of "automated software, devices, or other processes … designed to scrape the content, data or information from CasePortal …, or otherwise use, access, or collect the content, data, or information from CasePortal."  Https://search.cnscaseportal.com/terms-of-use (Para. 8(a), (d), (g), (j), (k) & (l)).  Absent evidence that these terms had been ineffective, which has never been presented, this argument cannot support dismissal of this case,[30] where CNS and Lee seeks to obtain information about new civil filings to further their right to gather and report news about them.

### CONCLUSION

Defendants' arguments have been rejected by *Hade I* at the same stage of the case, and by a host of Fourth Circuit precedent they never address.  Among other things, the Circuit has rejected the argument that restraining sources from providing information about civil litigation to the press does not "appreciably inhibit[] debate on the relevant public issues" if the "complaint

---

[30] The discussion about this theory at the hearing indicated the court thought the Access Restriction necessary to prevent "a detrimental economic impact on the clerk of courts' budgets" by protecting their revenue stream from OCRA, *CNS v. Hade*, Doc. 89 at 44, which even the Commonwealth recognized was not an argument "permitted … under the First Amendment."  *Id.*

46

and related filings are part of the public record" available at the courthouse. *Overbey*, 930 F.3d at 224 n.8; *see Wall Street J.*, 601 F. App'x 218-19 (citing *Nebraska Press Ass'n*, 427 U.S. at 562 (applying strict scrutiny to prior restraint on press); *Murphy-Brown*, 907 F.3d at 795-96.

While *Overbey* held "the relevant public discourse cannot be considered 'uninhibited' or 'wide-open'" when participants in civil litigation cannot provide information to the press about their case, 930 F.3d at 224 n.8, that is even more true of the Dissemination Restriction. It cuts off the press from sources that could provide information about newsworthy new civil filings that they are otherwise unable to report on *at all* when they cannot get to a remote courthouse, or a local one when the filing is near deadline. This undermines "the vital public interest in preserving the media's ability to monitor government activities," *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012), which requires "reasonably contemporaneous access" to information about new pleadings to allow the press and public to "play[] a positive role in the functioning of the judicial process." *Schaefer*, 2 F.4th at 327; *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("[s]uch monitoring is not possible without access" to information about filings in litigation). CNS and Lee thus respectfully request that the Court deny all Defendants' motions.

Dated: March 5, 2026                                  Respectfully Submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**          **TROUTMAN PEPPER LOCKE LLP**

By: */s/ Roger Myers*                                By: */s/ Dabney J. Carr IV*
Roger Myers                                          Dabney J. Carr IV
Rachel Matteo-Boehm                                  VSB No. 28679
Carlie Tenenbaum                                     Lauren H. Miller
(All Admitted Pro Hac Vice)                          VSB No. 100566
3 Embarcadero Center, 7th Floor                      P.O. Box 1122
San Francisco, California 94111                      Richmond, Virginia 23218
Tel: (415) 675-3400                                  Tel: (804) 697-1238
roger.myers@bclplaw.com                              dabney.carr@troutman.com
rachel.matteo-boehm@bclplaw.com                      lauren.h.miller@troutman.com

*Counsel for Plaintiffs Courthouse News Service, Lee Enterprises, Incorporated, Lee BHM LLC*

47